70 F.2d 313 (1934)
In re UNITED CIGAR STORES CO. OF AMERICA.
SALISBURY INV. CO.
v.
IRVING TRUST CO. et al.
HALLORAN
v.
IRVING TRUST CO.
No. 331.
Circuit Court of Appeals, Second Circuit.
April 9, 1934.
Kellogg, Emery & Inness-Brown, of New York City (Dean Emery, Douglas M. Black and George Koegler, all of New York City, of counsel), for Salisbury Investment Co.
Paul Williams, of New York City, for William J. Halloran.
Cravath, de Gersdorff, Swaine & Wood, of New York City (William D. Whitney, of New York City, of counsel), for Irving Trust Co. as Trustee in Bankruptcy.
*314 Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.
MANTON, Circuit Judge.
The United Cigar Stores Company of America, a New Jersey corporation, was adjudged a bankrupt on August 29, 1932. It leased a hotel in Salt Lake City, Utah, on November 12, 1919, from the appellant Salisbury Investment Company, for a term of years expiring December 31, 1940, with renewal privilege for 60 years more. The bankrupt agreed to demolish the existing buildings before January 1, 1936, and to build, within 20 months thereafter, new buildings to cost not less than $250,000.
The bankrupt, after entering into possession under this lease, on August 9, 1922, entered into a contract with William J. Halloran, appellant, with reference to the operation and management of the property. By that agreement, the parties were to share equally all the net profits derived from and sustain all losses incurred through the management of the premises under the lease. The net profits were to be determined after deducting all expenses of management and operation, a fixed compensation to Halloran, and a sum for auditing duties assumed by the bankrupt. The bankrupt paid rent for a cigar store occupied by it in the demised premises. The agreement provided that it was not to constitute an assignment of any interest of the bankrupt in and to the premises under the lease nor was it to establish a partnership relation. Moreover, the agreement provided that the construction of the new building under the terms of the lease should be provided for by saving all the net profits, if any, arising out of the premises after the payment of the service item to appellant Halloran and the auditing duties assumed by the bankrupt. There was to be no division or distribution of net profits, if any, until after the new building had been erected and all charges in connection therewith had been fully paid. And "in the meantime United shall be charged with interest upon any such net profits accumulated and remaining in its possession, at the rate of five per centum per annum * * * which interest shall likewise be credited to and become a part of the fund so to be provided for such new building."
It further provided that: "VII. After the completion of such new building so to be erected, United, at its option, shall have the right to withhold from the net profits, if any, of the premises such reasonable amount as it shall deem necessary for the purpose of providing a fund against future losses, upon which fund as long as the proceeds thereof shall remain in the possession of United, United shall be chargeable with interest at the rate aforesaid. United shall have the right, at its option, at any time, to pay over any funds accumulated hereunder to any bank or trust company to be held by such bank or trust company to the credit of United, and having done so, shall not be responsible for the solvency of any such institution, any such deposit relieving it from responsibility in regard thereto, subject, however, to the application of such fund as and when withdrawn by United under and in accordance with the terms of this agreement."
And further: "VIII. In the event of any expenditure whatsoever in connection with the said lease, whether by reason of the terms of the lease or because United in its discretion shall decide so to do, and if the fund then accumulated shall be insufficient at that time for the purpose, both parties hereto shall contribute equally upon demand of United, such amount as shall be deemed by United necessary to provide for any expenditure, but which fund shall be retained by United or by the institution chosen as custodian or depository until the expenditure is made."
After this agreement, the appellants carried out the terms of the agreement between them. The gross receipts from the operation of the hotel were deposited in several bank accounts of the bankrupt, which paid the expenses involved in the operation of the premises, drawing upon various of its bank accounts. At all times the aggregate amount of the bank accounts exceeded the amount of the net profits. The net profits were never segregated in a separate bank account, nor were the expenses in connection with the lease paid out of the same bank accounts in which the gross receipts were deposited. Entries were made on the bankrupt's books in two accounts, one crediting the net profit monthly as they accrued under the title of "William J. Halloran, Equity Fund 766," and the other "United Cigar Stores Co. of America, Equity Fund 766." At the time of adjudication in bankruptcy, it is stipulated the amounts were $77,563.77 and $79,119.04, respectively. Appellant Halloran claimed his sum as a trust fund and filed a reclamation claim. The Salisbury Company was granted permission to intervene. The referee disallowed the Halloran claim as a reclamation claim, but allowed it as a general claim, but the claim of the Salisbury Company was disallowed both as a reclamation claim and as a general claim.
*315 The appellants' agreement provided that the bankrupt retain the net profits for the purpose of providing funds for the building operation and also for any expenditures in connection with the lease. Thus the fund was not to be gathered for building only but for purposes of the lease. The bankrupt promised to pay interest, indicating a debtor and creditor relationship rather than that of trustee and beneficiary. A trust involves a specific subject-matter or res, while a debt does not. The obligation of a trustee is equitable rather than legal. A fiduciary relation exists in the office of a trustee. The appellants' agreement does not specifically provide for a trust; it does provide for net profits and the uses to be made of such profits. There was no segregation of the net profits or putting aside of such funds. Article VII provides for the disposition of the net profits after the performance of the building covenant. After completion of the building, the net profits were to be used as a fund against future losses. This negatives the claim of a trust fund for the benefit of appellant Salisbury Company.
The Salisbury Company argues that it brings its claim within the rule announced in McKee v. Lamon, 159 U. S. 317, 16 S. Ct. 11, 40 L. Ed. 165, namely, where money is placed in the hands of one person to be delivered to another, a trust arises in favor of the latter which he may enforce by a bill in equity; that is, that the acceptance of money with notice of the ultimate destination is sufficient to create a duty on the part of the bailee to devote it to the purposes intended by the bailor, and that, in enforcing such trust, a court of equity may make such orders as may be necessary for the proper protection and distribution of the funds. Its argument proceeds that, under the rule of Pennsylvania Steel Co. v. N. Y. C. R. Co. (C. C. A.) 198 F. 778, Id., 206 F. 663 (C. C. A. 2), a reclamation claim may be sustained upon the theory that it was intended to put aside moneys for erecting a building under the requirements of a lease for its benefit as a landlord. In other words, that the net profits were to be devoted to the specific purpose of erecting the building. But the agreement did not stop with that use of the money; it provided that the moneys would be applicable to losses if any were sustained.
Art. VII provided that the bankrupt should "have the right, at its option, at any time, to pay over any funds accumulated hereunder to any bank or trust company to be held by such bank or trust company. * * *"
This option to retain the fund or turn it over to a bank, considered with the interest provision, leads to the conclusion that United was free to use the gross revenues in its general business and without ever segregating the net profits at all. This power militates against the thought of an imposed duty of setting aside the money in a specific fund or establishing a res. In any case, there was no res until the bankrupt, after the net profits were calculated, set aside or segregated the amount thereof. No such fund was ever put aside or deposited. In 1931 the appellant Halloran wrote to the bankrupt stating that he supposed the United was using his money and that he was being allowed 5 per cent. for the same, but "I now see under the agreement that the United has the right at its option at any time, to pay over any funds accumulated to any bank or trust company to be held by such bank or trust company to the credit of the United. This, of course, I cannot object to provided that I receive the five per cent. interest which the United agreed to pay and surely, the money is worth five per cent. in the business of the United, and if not, my money should be invested in securities that would pay 5%, that is, good bonds and real estate mortgages."
Appellant Halloran had obligated himself to pay half the expenses in connection with the lease, and the effect of the agreement was that he provided the bankrupt with funds in advance of the time that he would otherwise have been obliged to provide them. In the meantime the indebtedness was drawing 5 per cent. interest. From the above, the intention of the parties to create a trust is not established. Certainly it was not the intention to create a trust for the benefit of the appellant Salisbury Company. Halloran and United intended to forego the distribution of profits to create a fund for Salisbury Company's benefit. If anything, their intent was to provide a fund for their own benefit. The appellant Salisbury Company, to be sure, was entitled, after breach or expiration of the lease, to the benefit of any new building that might be erected. But this was contingent and speculative. There was no assurance in advance of the date of obligation to erect that a fund would be provided for the purpose of this expenditure under the terms of the lease.
In the case of In re Interborough Consolidated Corp., 288 F. 334, 32 A. L. R. 932 (C. C. A. 2), it was held that a fund deposited in a bank for the payment of interest coupons was not a trust fund for coupon holders but a general deposit and passed to the receiver of the corporation. There was in that case a *316 specific fund deposited in a single bank and for a single purpose. It was separate from other funds of the insolvent and traceable. But this court found there was no trust created and no equitable lien was established.
In Pennsylvania Steel Co. v. N. Y. C. R. Co. (C. C. A. 2) 198 F. 778, Id., 206 F. 663 (C. C. A. 2), bonds of the lessor railway company were issued to a security company under an agreement that the latter would pay the lessee and that the lessee would use the proceeds exclusively for the purpose of complying with the terms of the lease relating to the improvement of the leased property. The receiver for the lessee recovered the moneys due from the security company, and the question presented was how the funds should be distributed between the estates of the lessee and the lessor. It was held that the estate of the lessee was only entitled to retain an amount sufficient to pay creditors who had contributed materials or services to the improvement of the lessor's property. The amount thereby was held to be a specific trust fund, identifiable, and created, not by the original lease, but by the court's decree. Materialmen were held to be entitled to receive the benefit of it.
A third party beneficiary under a contract must be shown to be clearly and directly intended as such beneficiary. In re Gubelman, 13 F.(2d) 730, 731, 48 A. L. R. 1037 (C. C. A. 2). It is not enough that the contract may operate to his benefit; it should appear that the parties intended to recognize the beneficiary as a primary party in interest and as privy to the promise. Pennsylvania Steel Co. v. N. Y. C. R. Co., 198 F. 721 (C. C. A. 2).
Moreover, if a trust relation had been established, the res has not been identified or traced to the trustee in bankruptcy. St. Louis & San Francisco R. Co. v. Spiller, 274 U. S. 304, 47 S. Ct. 635, 71 L. Ed. 1060; In re T. A. McIntyre & Co., 185 F. 96 (C. C. A. 2); In re See, 209 F. 172 (C. C. A. 2). If a trustee mingles the trust funds with the mass of his other funds, as long as there remains on hand a sufficient sum to cover the amount of the trust fund, the cestui que trust may follow the trust fund and reclaim it. Schumacher v. Harriett, 52 F.(2d) 817, 82 A. L. R. 1 (C. C. A. 4). There can be no recovery, however, where all that can be shown is enrichment of the trustee. It must be clearly traced and identified in specific property. In re See, supra; In re T. A. McIntyre & Co., supra. It is insufficient to show that trust property went into the general estate and increased the amount and the value thereof. Empire State Surety Co. v. Carroll County, 194 F. 593 (C. C. A. 8). In the instant case the appellants have failed to show more than a general enrichment of the bankrupt's estate. The bankrupt's accounts appear to have been active. There might have been a reduction of each of these accounts in turn to practically nothing, and yet the aggregate be above the alleged trust fund amount at all times. To recover, the funds must be traced into the estate and there now be found. Lucas County v. Jamison (C. C.) 170 F. 338. There is no evidence that the trust fund has remained intact during the period of the trustee's possession.
The court below properly allowed the appellant Halloran's general claim for the indebtedness to him and disallowed the claim of the appellant Salisbury Company.
Order affirmed.