**In re UNITED STATES LINES, INC., Debtor.**

**AMERICAN HULL INSURANCE SYNDICATE, Arkwright–Boston Manufacturers Mutual Insurance Company, New Hampshire Insurance Company, New York Marine Managers, Inc., United States Fidelity & Guaranty Co., Ranger Insurance Company, Underwriters at Lloyd's and Institute Companies Through Price Forbes Limited, Plaintiffs,**

v.

**UNITED STATES LINES, INC. and Citibank, N.A., Defendants.**

**Bankruptcy Nos. 86 B 12240, 87–5039A.**

United States Bankruptcy Court, S.D. New York.

Oct. 21, 1987.

Thacher Proffitt & Wood, New York City by Raymond S. Jackson, Jr. and Sheldon A. Vogel, for plaintiffs.

Milbank, Tweed, Hadley & McCloy, New York City by John Gellene and Lorraine Stinnette, for defendant U.S. Lines, Inc.

Shearman & Sterling, New York City by Joseph P. Cyr, for defendant Citibank, N.A.

## DECISION

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

Plaintiffs, an unincorporated group of insurers of the S.S. AMERICAN APOLLO, a vessel owned and operated by the debtor United States Lines, Inc. ("U.S. Lines"), seek to reclaim sums totalling $1,899,-448.22 paid to the debtor pursuant to an insurance agreement. Plaintiffs bring this adversary proceeding to impose a constructive trust on $445,159.12 of the total. They also assert priority claims of $999,265.55 less all or part of $56,159.12 depending

upon the recovery under their constructive trust claims. Plaintiffs concede that they hold a general unsecured claim for that portion of the total depleted pre-petition, or $511,182.67. The Debtor maintains that Plaintffs' claim is entirely a general unsecured claim.

### I.

On October 1, 1980, the S.S. AMERICAN APOLLO grounded on the West bank of San Pablo Reach in the Panama Canal sustaining substantial damage covered by the insurance provided by Plaintiffs. In 1981–84 Plaintiffs paid a total of $1,963,420.29 to the U.S. Lines on the policy.

At the time of the grounding, the authority of the Panama Canal Commission (the "Commission") to adjust claims for damages due to its negligence in Canal Zone water occurring outside of Canal Locks was limited to $120,000. Only Congress could authorize greater payment. By amendment to the Panama Canal Act 22 U.S.C. § 3601 *et seq.* (1982, S.Supp. III 1986) that became law on December 25, 1985, the Commission was granted unlimited authority to adjust and settle maritime claims.

After the amendment, U.S. Lines subsequently recovered sums totalling $5,750,000.00 from the Commission. This amount was deposited by wire transfer into the its general bank account at The First National Bank of Atlanta (the "Atlanta Account") on October 9, 1986. As agent of the insurers, Alexander & Alexander prepared a "Statement of Particular Average Recovery" in the Fall of 1986. By letter dated October 22, 1986, Alexander & Alexander informed U.S. Lines that the draft "recovery adjustment" had been sent to the printers and showed that Plaintiffs were due $1,884,549.64. A final "recovery adjustment" was sent to U.S. Lines on October 30, 1986 and the claim repeated. The Statement of Particular Average Recovery was issued on December 4, 1986.

On November 24, 1986, the Debtor filed a petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (1986) (the "Code"). On that date, the balance in the Atlanta Account was $1,388,265.55. On January 30, 1987, Plaintiffs filed their Complaint, claiming constructive trust on the lowest intermediate balance in the Atlanta Account. A temporary restraining order and preliminary injunction subsequently were entered restraining U.S. Lines from withdrawing funds from the Atlanta Account that would reduce that account below the lowest intermediate balance from the filing date. The balance in that account now stands at $389,000.

From November 25, 1986 through April 8, 1987, $999,265.55 was withdrawn from the Atlanta Account. This sum includes $50,000 withdrawn from the Atlanta Account and deposited in the Debtor's account at Citibank ("Citibank Account") and $130,000 withdrawn from the Atlanta Account and deposited in the Debtor's account at Continental Bank in Chicago ("Continental Account"). Of these sums, the entire $50,000 transferred to the Citibank Account and $6,159.12 deposited in the Continental Account reduced the lowest intermediate balance of the Atlanta Account. The preliminary injunction was amended on May 26, 1987 to restrain withdrawal of $50,000 from the Citibank Account and $6,159.12 from the Continental Account.

By their amended complaint, Plaintiffs seek constructive trusts with respect to the $389,000 in the Atlanta Account, $50,000 in the Citibank Account and $6,159.12 in the Continental Account. They seek alternative priorities for $999,265.55, less $56,159.12 if a constructive trust is imposed with respect to the $50,000 remaining in the Citibank Account and the $6,159.12 remaining in the Continental Account. Trial was held on September 15, 1987.

### II.

■ A constructive trust is a court created equitable remedy to prevent unjust enrichment. *See, e.g., In re Black & Geddes, Inc.*, 35 B.R. 830, 836 (Bankr.S.D. N.Y.1984). The imposition of such a trust presumes (1) entitlement to specific property, (2) the existence of a *res*, and (3) the ability to trace the property. *E.g., American Service Co. v. Henderson*, 120 F.2d

525, 531 (4th Cir.1941); *see also In re Branch Motor Express,* 51 B.R. 146 (Bankr.S.D.N.Y.1985); *Bateman v. Patterson,* 212 Ga. 284, 92 S.E.2d 8 (Ga.1956).

Under general insurance law, "where an insured has received from the insurer an amount which is a full satisfaction for the loss sustained, he will, upon recovery from the wrongdoer, hold so much of such sum as may be necessary to reimburse the insurer in trust for the latter." 16 *Couch on Insurance 2d,* § 61:29 (Rev.Ed.1983). *See* 6A J.A. Appleman and J. Appleman, *Insurance Law and Practice* § 4096 (Rev.Ed. 1972). Not to the contrary is *Arkwright Mutual Insurance Co. v. Bargain City, USA, Inc.,* 251 F.Supp. 221 (E.D.Pa.1966), *aff'd,* 373 F.2d 701 (3rd Cir.1967), *cert. denied,* 389 U.S. 825, 88 S.Ct. 63, 19 L.Ed.2d 79 (1967), upon which U.S. Lines relies. There the insurer loaned sums to the insured in anticipation of payment by the wrongdoer and thereby structured their relationship as that of an unsecured loan. The court accordingly refused to disturb that relationship by imposing a constructive trust. Here the relationship is that described in *Couch* and *Appleman.* Consequently, U.S. Lines assumed a duty of restitution to Plaintiffs when it received payment from the Commission. This duty is enforceable in equity through the doctrine of constructive trust.

■ The remedy of a constructive trust, however, requires and is limited to the trust *res* identified directly or by tracing the property to which the claimant is entitled. *See In re Trafalgar Associates,* 53 B.R. 693, 695 (Bankr.S.D.N.Y.1985); *Bateman v. Patterson,* 212 Ga. 284, 92 S.E.2d 8 (Ga.1956).

■ Here, the proceeds recovered from the Commission were paid directly into U.S. Lines general bank account in Atlanta. Where, as in this case, trust funds are commingled with non-trust funds, the court applies the "lowest intermediate balance test."

> The situation frequently occurs where trust funds have been traced into a general bank account of the debtor. The following general principles have been applied. The bankruptcy court will follow the trust fund and decree restitution when the amount of the deposit has at all times since the intermingling of funds equaled or exceeded the amount of the trust fund. But where, after the appropriation and mingling, all of the moneys are withdrawn, the equity of the cestui is lost, although moneys from other sources are subsequently deposited in the same account. In the intermediate case where the account is reduced to a smaller sum than the trust fund, the latter must be regarded as dissipated, except as to the balance, and funds subsequently added from other sources cannot be subjected to the equitable claim of the cestui que trust. If new money is deposited before the balance is reduced, the reduction should be considered to be from the new money and not from the monies held in trust. This analysis may be referred to as the lowest intermediate balance test.

4 *Collier on Bankruptcy* ¶ 541.13 at 541–73 (15th ed. 1986) (footnote omitted).

■ Plaintiffs' exhibit "A" shows that between October 9, 1986 when U.S. Lines received the funds from the Commission, and the issuance of the preliminary injunction, the lowest intermediate balance in the Atlanta Account was, and is, $389,000.00.

U.S. Lines argues that overnight loans made by itself from the Atlanta Account should be excluded in computing the lowest intermediate balance, thereby reducing the lowest intermediate balance to $372,503.90. These loans, however, were subsequently redeposited at the beginning of the next day and in no way dissipated the Atlanta Account. *See Restatement (Second) of Trusts* § 202 Comment 1 (1959). *Restatement of Restitution* § 213 Comment d (1982).

■ Plaintiffs also seek to impress a constructive trust on the $50,000 deposited into the Citibank Account and $6,159.12 out of a total of $130,000.00 deposited into the Continental Account. Redeposit, however, does not preclude imposition of a constructive trust if the funds redeposited are

traceable. *Restatement (Second) of Trusts* § 202 Comment 1 (1979). Plaintiffs' exhibit "B" shows that funds totalling $56,-159.12 have been traced from the Atlanta Account into the two accounts. Since they are thus available for reclamation, plaintiffs are entitled to them as constructive beneficiaries.

■ In response U.S. Lines claims that it received the sum within 90 days of the filing of the bankruptcy petition and that a payment to plaintiffs prior to the filing of its petition would have been on account of an antecedent debt and thus a preference under § 547 of the Code. It thus argues that to now impose a constructive trust is to effectively permit a preference. This argument ignores, *inter alia*, that for a transfer to be preferential, the transferee would receive more than it would receive in a chapter 7 liquidation (§ 547(b)(5)) and that the constructive trust doctrine and remedy would be applicable to a *res* held by a trustee in chapter 7. Thus, the fifth element of a preference would not be met. Furthermore, payment of property held under a duty of restitution has long been held not to be preferential. *See Morris Plan Indus. Bank v. Schorn*, 135 F.2d 538, 539 (2d Cir.1943).[1]

### III.

Recognizing the inability to trace some $943,000 that remained in the Atlanta Account when U.S. Lines filed its bankruptcy petition and was subsequently withdrawn, plaintiffs assert that they are entitled to priority status pursuant to §§ 364(c)(1), 507(b) and 503(b)(1)(A) of the Code. They ground that claim on the argument that a constructive trust arose on the delivery of the funds from the Commission and that it continued after bankruptcy. Plaintiffs then assert that: (i) they, in effect, made a loan to the debtor of the $943,000 under § 364(c) and are entitled to the super priority granted by § 364(c)(1); (ii) the funds constituted cash collateral under § 363(a), were used without their consent and that they are entitled to the super priority of § 507(b); or, alternatively, (iii) the funds must have been utilized to pay post petition creditors who would have had a § 503(b) and § 507(a) priority to which plaintiffs succeeded by virtue of subrogation.

■ It initially appeared that this claim presented for resolution whether under Georgia law a constructive trust ordered by a court comes into existance at the time of the order or comes into existance at the time when the claims for restitution arose, and therefore resolution of the debate between two principal treatises.[2] That exercise, however, need not be performed here. Not even the authorities relied on by plaintiffs for the proposition that the trust and the duty arise concurrently impose a con-

---

1. In its answer, U.S. Lines asserts that other "actual and potential trust claimants" may have a claim to the funds in the Atlanta Account thereby invoking the rule that lowest intermediate balance test does not apply when the fund is comprised of funds subject to claims of a myriad of persons. *Cunningham v. Brown*, 265 U.S. 1, 13, 44 S.Ct. 424, 427, 68 L.Ed. 873 (1924). No evidence of such claims was presented at trial. At trial, it also asserted that the Citibank and Continental accounts were special accounts to which constructive trust proceeds could not be traced as a matter of law. To support that proposition, it requested that the court consider, pursuant to Rule 65 of the Federal Rules of Civil Procedure, the evidence presented at the May 26, 1987 hearing on Plaintiffs' motion to amend the preliminary injunction. No evidence, however, was presented at that hearing. The summary of bank statements attached to the papers showed that sums deposited in the Continental account were largely withdrawn contemporaneously with their deposit, but not all were.

Citibank, in its answer asserts a right of set-off. No evidence supporting that right, if any, was presented at trial.

2. V.A. Scott, *The Law of Trusts,* § 462.4 (3d ed. 1967) (constructive trust arises at moment of unjust enrichment); G. Bogert, *Trusts and Trustees,* § 472 (2d ed. 1978) (constructive trusts arises only after imposed by court). *Compare In re Vichele Tops, Inc.,* 62 B.R. 788 (Bankr.E.D. N.Y.1986); *Capital Investors Co. v. Morrison,* 800 F.2d 424, 427 n. 4 (4th Cir.1986), *Stansbury v. United States,* 543 F.Supp. 154, 157 (N.D.Ill. 1982), *aff'd,* 735 F.2d 1367 (7th Cir.1984); *United States v. Fontana,* 528 F.Supp. 137, 146 (S.D. N.Y.1981); *In re Atlantic Mortgage Corp.,* 69 B.R. 321, 328 (Bankr.E.D.Mich.1987) (following Scott) *with In re Anderson,* 30 B.R. 995, 1014 (M.D.Tenn.1983); *In re Tinnell Traffic Services, Inc.,* 41 B.R. 1018, 1021 (Bankr.M.D.Tenn.1984) (following Bogert). No cases under Georgia law have been cited to us on this issue.

structive trust on non-traceable property. In *United States v. Fontana*, 528 F.Supp. 137 (S.D.N.Y.1981), for example, the court construed New York cases stating that a constructive trust arises in equity and could be applied to a fund previously attached by the putative beneficiary to defeat a tax lien notwithstanding the absence of a court decree declaring the trust. *Accord, Stansbury v. United States*, 543 F.Supp. 154 (N.D.Ill.1982) (gross estate does not include traceable property conveyed by decedent prior to death although state court judgment imposing constructive trust was entered after death), *aff'd*, 735 F.2d 1367 (7th Cir.1984).

■ Thus, where, as here, a portion of the property or its proceeds is traceable, the "enforcing plaintiff has the right to receive the property or its proceeds from the constructive trustee ... as well as the right to receive a money judgment for property received against the constructive trustee." *Capital Investors Co. v. Morrison*, 800 F.2d 424, 427 (4th Cir.1986) (citations omitted). This is so because of the constructive trustee's duty to deliver the trust *res;* where the *res* proceeds were partially segregated or otherwise partially traceable, only a money judgment can be ordered for the remainder. *Ibid.;* V.A. Scott, *The Law of Trusts*, § 521 at 3649–50 (3d ed. 1967) ("Scott"). Consequently, even under the doctrine that the trust arises independently of a court order, all that plaintiffs would be entitled to is a money judgment for the non-traceable sum wrongfully retained by U.S. Lines. What is sought here is to convert to a priority claim the portion of that judgment relating to the Atlanta Account balance when U.S. Lines filed its bankruptcy petition.

Under the former Bankruptcy Act, it was established that if trust funds cannot be traced due to pre-petition commingling the beneficiary's claim is to be classified as that of a general creditor. *E.g., Schuyler v. Littlefield*, 232 U.S. 707, 713, 34 S.Ct. 466, 468, 58 L.Ed. 806 (1914); *Elliott v. Bumb*, 356 F.2d 749 (9th Cir.1966); G. Bogert, *The Law of Trusts and Trustees*, § 921 at 367–69 (2d ed. rev. 1978) ("Bo-

gert"). The reasons for this rule lie in the reluctance of equity to make general creditors fully pay for the sins of a bankrupt with respect to other creditors prior to receiving a dividend. *See In re Black & Geddes, Inc.*, 35 B.R. at 836; *In re Penn–Dixie Steel Corp.*, 6 B.R. 817, 824–25 (Bankr. S.D.N.Y.1980), *aff'd* 10 B.R. 878 (S.D.N.Y.1981).

As the Ninth Circuit ruled, under the predecessor statute to the Bankruptcy Act, a claim for nontraceable funds subject to a constructive trust could not be afforded a priority:

We are unable to assent to the proposition that, because a trust fund has been used by the insolvent in the course of his business, the general creditors of the estate are by that amount benefitted, and that therefore equitable considerations require that the owner of the trust fund be paid out of the estate to the postponement or exclusion of the general creditors. If the trust fund has been dissipated in the transaction of business before insolvency, it will be impossible to demonstrate that the estate has been thereby increased or better prepared to meet the demands of creditors, and, even if it is proven that the trust fund has been used to pay debts that otherwise would be claims against the estate, there would be manifest inequity in requiring that the money so paid out should be refunded out of the assets, for in so doing, the general creditors whose demands remained unpaid are in effect contributing to the payment of creditors whose demands have been extinguished by the trust fund.

*Spokane County v. First National Bank of Spokane*, 68 F. 979, 982 (9th Cir.1895).

So firmly fixed was this rule of retaining priorities under the Bankruptcy Act that the Supreme Court applied it to a post-petition depletion of a trust. In *United States v. Randall*, 401 U.S. 513, 91 S.Ct. 991, 28 L.Ed.2d 273 (1971), the Court refused to award a super priority in a case where a debtor-in-possession had stolen income and FICA taxes withheld from employees post petition in violation of the trust impressed

by statute upon the funds withheld. One would think that in light of subrogation principles, *see* Scott, § 513 at 3601–02, or *Reading v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968) that the court would have at least found the claim to have a first priority as an administrative claim. *Reading* held that a claim for damages due to a tort committed by a debtor-in-possession post petition is to be accorded administrative claim status. Nevertheless, the *Randall* court stated, "We deal, however, with a Bankruptcy Act which we conclude is an overriding statement of federal policy on this question of priorities," 401 U.S. at 515, and observed that Congress had provided that tax claims enjoy a lesser priority than administrative claims. In so ruling, the court added that the statutory policy creating the lesser priority

> would not be served by creating or enforcing trusts which eat up an estate, leaving little or nothing for creditors and court officers whose goods and services created the assets. In *Nicholas v. United States*, 384 U.S. 678, 690–692 [86 S.Ct. 1674, 1683–1684, 16 L.Ed.2d 853 (1966) ], we rejected the claim of the United States that under § 7501(a) of the Internal Revenue Code it was entitled to interest accruing after the arrangement under Chapter XI and during the bankruptcy. We so held because to allow interest would run counter to the 'strong policy of § 64(a)(1) of the Bankruptcy Act.' *Id.*, at 691 [86 S.Ct. at 1683]. To allow the present claimed priority for the principal would by the same token run counter to the grain of the Bankruptcy Act.

401 U.S. at 517, 91 S.Ct. at 994.

Even under constructive trust doctrine, there is reluctance to change priorities for claims not based on the debtor's possession of property:

> The general principle that equality is equity is a good one. If one claimant in the distribution of the estate of an insolvent seeks to be paid ahead of the other claimants, it is for him to show a good reason ... Justice between the insolvent and his creditors would require that all the creditors should be paid in full. This, however, is impossible as long as blood

cannot be obtained from a turnip. It is impossible to give every claimant priority over every other claimant. Unless a particular claimant can show that the wrongdoer still has his property, in one form or another, he should share ratably with the other creditors.

Scott, § 521 at 3651–52.

██ It is against this backdrop of strong resistance to granting a priority for claims based on a constructive trust for untraceable funds that plaintiffs' assertions of priority are to be tested. The Bankruptcy Code is not to be interpreted to do away with prior authoritative holdings absent an explicit indication of such intent by Congress.

> The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific. The Court has followed this rule with particular care in construing the scope of bankruptcy codifications.

*Midlantic National Bank v. New Jersey Dept. of Environment Protection*, 474 U.S. 494, 106 S.Ct. 755, 759–60, 88 L.Ed.2d 859 (1986); *see also Kelley v. Robinson*, —— U.S. ——, 107 S.Ct. 353, 358, 93 L.Ed. 2d 216 (1986); (Congress is not to be deemed to have "silently-abrogate[d]" prior authoritative judicial rulings in enacting the Code).

██ With respect to plaintiffs' claims of a priority under § 364(c), no such intent can be found. The statute plainly requires that lending on a super priority basis be approved by the bankruptcy court only if the court makes certain findings, including the unavailability of other credit. *In re Gloria Manufacturing Corp.*, 65 B.R. 341 (E.D.Va.1985), relied on by plaintiffs, is of no assistance to them here. There, a postpetition lender who neglected to secure the requisite court order until after advancing funds to a debtor-in-possession was given a super priority notwithstanding § 364(c)'s requirement of a prior court order, on the basis of the bankruptcy court's statement that it would have granted the super priori-

ty before the loan was made. That case is no indicia of Congressional intent to give a super priority here in light of *Randall.* In *Randall*, the debtor-in-possession violated a court order requiring it to establish a separate withholding account and disbursed statutory trust funds. The Court, nevertheless, refused to change the priority scheme.

■ Similarly, there is no indication that Congress sought to reverse the *Randall* Court's reasoning by treating a post-petition dispersal of funds that might be subject to a constructive trust as an unauthorized use of cash collateral. While the court in *Owens–Corning Fiberglas Co. v. Center Wholesale Inc. (In re Center Wholesale Inc.),* 788 F.2d 541 (9th Cir.1986) granted a § 507(b) super priority to a lienor whose cash collateral was used by a debtor-in-possession without adequate notice it followed its own suggestion on an earlier appeal of the same case. *See* 759 F.2d 1440 (9th Cir.1985). That suggestion was made in order to avoid unwinding transactions that had taken place in reliance on a bankruptcy court order and recognized that to do so was "not literally within the provisions of § 507(b) ... [but] clearly within its spirit...." 759 F.2d at 1451 n. 23. That the statutory language of § 507(b) limits the super priority there afforded to instances where previously granted adequate protection had proven inadequate offers no support for the notion that Congress sought to reverse prior authority applicable here.

Moreover, Congress, in § 363(a), defined cash collateral as property in which both the estate and another have an interest. Here, plaintiffs deny that the estate had any interest in the funds. (Tr. p. 16). In addition, the legislative history makes plain that Congress' focus was on property that served as collateral for a lien or was subject to co-ownership. S.Rept. No. 95–989, 95th Cong., 2d Sess 55 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. There is simply no indication that Congress, by defining cash collateral in terms of interest of two parties, intended to change the reasoning that stood in place prior to adoption of the Code with respect to the priority to be given to post-petition disbursement of funds that might be subject to a trust. Indeed, from the legislative history of § 541(a) where Congress does refer to constructive and statutory trusts covering funds received by a debtor for payment to a creditor as non-estate property, H.Rept. No. 95–595, 95th Cong. 1st Sess. 368 (1977); S.Rept. No. 95–989, 95th Cong. 2d Sess. 82 (1978), it appears that Congress was aware that debtors may come into bankruptcy with property subject to a duty of restitution for which constructive trust could be ordered.[3] Congress, nevertheless, did not create a super priority for claims arising from post-petition dispersal.

■ In this, our concern is statutory interpretation in light of the methodology required by *Midlantic.* We are not here faced with one or two lower court cases that Justice Rehnquist, although agreeing with the methodology, found not authoritative in his dissent. *Midlantic*, 106 S.Ct. at 764. Rather, this statute is to be interpreted in light of a prior refusal by even

**3.** In *Lane Bryant Inc. v. Vichele Tops, Inc., (In re Vichele Tops, Inc.,* 62 B.R. 788, 791 (Bankr.E.D. N.Y.1986)) upon which plaintiffs rely, it is stated that this legislative history indicates "that Congress viewed the creation of a constructive trust as occurring at the time of the circumstances giving rise to the duty to surrender the property, a pre-petition event.... any other interpretation of the legislative history would require a pre-petition judicial imposition of the trust as a prerequisite to its enforcement against the estate." (citations and footnote omitted). This *dicta* is erroneous. Nothing indicates that Congress sought to resolve this state law issue. Moreover, pre-petition enforcement is not required by those cases following Professor Bo- gert's theorem. *See In re Anderson,* 30 B.R. 995 (M.D. Tenn.1983); *In re Tinnell Traffic Services, Inc.,* 41 B.R. 1018 (Bankr.M.D.Tenn.1984). Indeed, *Vichele Tops* refused to find a trust due to the lack of a trust *res.* Moreover, the court added that even if the *res* could be identified through tracing, no constructive trust could be imposed because "any relief granted by the plaintiff will come out of the pockets of the creditors, not the debtors." 62 B.R. at 792. To refuse to impose a constructive trust where the *res* can be identified is, in our view, also erroneous. All that *Vichele Tops* can be said to stand for is the need for a *res* and the reluctance to change the priority scheme.

550

the Supreme Court to grant priority where funds assertedly held in trust were disbursed post-petition and cannot be traced.

In arguing for an administrative first priority on the basis that the constructive trust came into being on October 9, 1986 and was consequently in effect to give them a property interest in the Atlanta Account funds when U.S. Lines filed its bankruptcy petition on November 24, 1986, plaintiffs state that unless U.S. Lines "is guilty of gross malfeasance," $943,000 was used to pay administrative creditors who, if not paid would have had administrative priority claims under § 503(b) and § 507(a). They then claim to succeed to that priority by virtue of subrogation.

This argument has a certain logic to it but it raises several concerns. First is its somewhat speculative nature given the lack of identification of the creditors to whose claims plaintiffs would succeed. It may not be the case that the Atlanta Account funds were used only to pay administrative creditors. For example, in many large cases, orders are entered providing for payment of employees wage and benefits which enjoy third and fourth priorities, §§ 507(a)(3, 4). To continue insurance policies, orders are entered permitting payment of pre-petition insurance premiums. Even as to administrative claims, the § 507(a)(1) priority is limited to "actual, necessary costs of preserving the estate...." § 503(b). It is plaintiffs' burden to establish the priority they claim by identifying the recipients to whose claim they would succeed by subrogation. Absent such, the court would be in the position of awarding a first priority when the facts might not warrant it and without any ability to determine if the requirements of § 503(b) have been met.

Moreover, no case cited to us or that have we been able to find has granted such a priority in a bankruptcy context. Scott, in stating that one succeeds to a priority where his money is wrongfully used to pay a priority creditor, refers only to state law cases and principally to those where, unlike here, the money was wrongfully acquired. Scott § 513. More importantly, it is clear that Scott's statement presumes identification of the specific priority creditor rather than a speculative mass of creditors. *Randall* did not expressly concern the question in focusing on an attempt, in bankruptcy, to elevate a tax priority claim to a super priority claim by use of trust theory.

But the reasoning of the *Randall* Court in refusing to create or enforce trusts through the creation of a priority and thereby disturb the priority scheme and burden others is applicable here. Prior to the bankruptcy, plaintiffs had a claim for return of the entire sum. Because a portion of the sum remaining in U.S. Lines' hands when it filed its petition cannot be traced, Plaintiffs seek an administrative priority for its return. They thus seeks to elevate a portion of their pre-petition claim to administrative status through constructive trust theory. *Randall* counsels against precisely that in its holding that trust doctrine is not to be employed to change the statutory priority scheme in bankruptcy.

Plaintiffs, nevertheless, assert that § 507(d) governs. That section precludes the doctrine of subrogation from elevating those who pay certain priority claims to the priority status of the creditor. It does not cover administrative claims. But there is nothing in § 507(d) or the legislative history indicating that, by enacting § 507(d), Congress intended to elevate a pre-petition restitution claim to post-petition status or to effectively impose a constructive trust by awarding a priority claim notwithstanding the inability to trace the funds.

Here, the legislative history demonstrates that Congress focused on *Randall* even to the extent of mentioning the case by name and suggesting that courts assume that funds remaining in a debtor's checking account are the withheld taxes that the debtor held pursuant to a statutory trust and failed to segregate. 124 Cong.Rec.H. 11,114 (Sept. 28, 1978); S. 17–430–1 (October 6, 1978). Nevertheless, Congress gave no indication that it thought to overturn the *Randall* court's reasoning with respect to creation of a priority where

assets subject to even a statutory trust have been dissipated and cannot be traced. In light of that history, it can hardly be said that Congress thought to award a priority where assets possibly subject to the more ephemeral notion of a constructive trust cannot be traced. Thus § 507(d) is similar to § 554(a) addressed by the *Midlantic* Court. In permitting abandonment, § 554(a) attached no conclusion of compliance with state environmental laws. But because pre-Code authority had attached such a condition to the former Bankruptcy Act and the Court found no specific intention to overrule that authority, it held that such compliance was required.

These observations bring us full circle to the debate between Professors Scott and Bogert regarding the existance of a constructive trust prior to court order. To Professor Bogert's contention that the trust arises through court order and only then is the interest in property fixed, G. Bogert, § 472, Professor Scott assumes that the funds can be identified directly or through tracing "at the time he seeks to enforce his claim," Scott, § 521 at 3649, and replies, "This introduces a quite unnecessary fiction. If the results are the same as though the constructive trust arose at the beginning, there is no good reason for saying that it did not arise at the beginning." Scott, § 462.4 at 3421 n. 1. Where, however, the funds cannot be traced in a bankruptcy proceeding due to dissipation post-petition, there is a good reason. Absent a direction from Congress, a priority should not be created, in light of *Randall*, to the detriment of other creditors, including possibly priority creditors, on the basis of the theory that the trust then existed and thereby partially convert a pre-petition general claim to a priority claim.

Plaintiffs are, therefore, entitled to judgment enabling them to recover $389,000 from the Atlanta Account, $50,000 from the Citibank Account and $6,159.12 from the Continental Account and denying their demand for judgment declaring that they have a priority claim pursuant to § 364(c), § 507(a) or § 507(b) of the Code. The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.