In re **DREXEL BURNHAM LAMBERT GROUP, INC., et al., Debtors.**

**P.T. TIRTAMAS MAJUTAMA, Plaintiff–Appellant,**

v.

**DREXEL BURNHAM LAMBERT GROUP, INC., Defendant– Appellee.**

**Bankruptcy No. 90 B 10421 (FGC). Adv. No. 90–5571A (FGC). No. 92 Civ. 1852 (MP).**

United States District Court, S.D. New York.

July 6, 1992.

See also 140 B.R. 367.

Charles B. Cohler, Lasky, Haas, Cohler & Munter, San Francisco, Cal., Paul Windels III, Perry & Windels, New York City, for plaintiff-appellant P.T. Tirtamas Majutama.

Susan Buckley, Cahill, Gordon & Reindel, New York City, for defendant-appellee DBL Liquidating Trust, as successor to Drexel Burnham Lambert Group, Inc.

## OPINION

MILTON POLLACK, Senior District Judge:

Appeal from the grant of summary judgment in favor of the debtor, Drexel Burnham Lambert Group, Inc. ("Group"), granted by Bankruptcy Judge Francis G. Conrad on a claim against the bankrupt's estate seeking to establish a constructive trust on a part payment for assets purchased by P.T. Tirtamas Majutama ("Appellant") from Group prior to the latter's bankruptcy. The money received on the transaction, as well as all of Group's other funds, were completely dissipated before the bankruptcy, as was shown by a tracing permitted of all of the bankrupt's accounts. Further tracing of the supposed trust *res* to third parties was denied by the Bankruptcy Court as unnecessary and inappropriate for this claim against the bankrupt. The judgment of the Bankruptcy Court is affirmed.

Group's motion to dismiss the appeal for failure to timely comply with briefing requirements is denied.

## I. FACTUAL BACKGROUND

On November 30, 1989, pursuant to a letter agreement, the Appellant made a non-refundable $2 million payment toward the purchase price of certain assets owned by Group, composed of debt and equity of a petroleum corporation. There was no requirement that the payment should be escrowed, segregated, held in trust or otherwise earmarked. The payment was deposited in Group's principal bank account at Citibank and commingled with Group's other funds.

Claiming to be dissatisfied with Group's representations of the transaction, on January 19, 1990, the Appellant demanded the return of the earnest money it had paid to Group, which Group refused to do. In fact, by January 16, 1990, the funds in Group's bank accounts had been completely dissipated by transactions made in the ordinary course of its business.

On March 5, 1990, Group filed a Chapter 11 petition under the Bankruptcy Code.

Appellant then filed this adversary proceeding charging violations of federal securities laws and also asserting state law causes of action, alleging that the offering documents on its transaction with Group were materially false and misleading. Appellant sought the impressment of a constructive trust on the $2 million payment that it had made—which, if available, would have placed the Appellant in line before all general creditors—and sought a declaration that Group's "debt" to Appellant would not be dischargeable under the Bankruptcy Code.

On November 21, 1990, the Bankruptcy Court dismissed all of the Appellant's claims except the claim regarding the constructive trust and ordered discovery. Group produced its Citibank statements demonstrating that the principal Group account into which the $2 million had been deposited, was completely dissipated.[1] Group also produced in the discovery proceedings the account statements of other Group bank accounts as well as the statements for every Drexel entity that had received funds from the Group account for the relevant period.

On November 13, 1991, Group renewed an earlier motion for summary judgment which had been denied pending discovery. The Bankruptcy Court granted the motion on December 19, 1991. Bankruptcy Judge Conrad ruled that "there is no genuine issue of material fact in dispute as to the inability of plaintiff to trace a trust *res* under governing law. Because the record demonstrates an absence of evidence to support an essential element of plaintiff's constructive trust claim—the tracing of a trust *res*—defendant is entitled to judgment as a matter of law."

Appellant filed a notice of appeal on February 11, 1992, which was docketed in this Court on March 16, 1992. Under Bankruptcy Rule 8009(a)(1), the Appellant's appeal brief was due on April 4, 1992. The Appellant did not file its brief until May 12, 1992.

---

**1.** The Appellant conceded in the record and again at oral argument of this appeal that the money balance of the Group account dropped below $0 in January 1990.

On May 29, 1992, the DBL Liquidating Trust (as bankruptcy successor to Group) filed a motion to dismiss the appeal for failure to comply with the rule fixing the time for filing of a brief, Bankruptcy Rule 8009(a)(1), but nevertheless filed a separate brief addressing the merits of the appeal.

## II. ANALYSIS

### A. Failure to Comply With Bankr.R. 8009—Timeliness

■ The Appellant filed its appeal brief more than a month after it was due. The time frame for filing briefs on appeal from Bankruptcy Court orders is established in Bankruptcy Rule 8009 which mandates the filing within 15 days after entry of the appeal on the docket. The district court may excuse non-compliance or grant specific other limits. The failure to offer an acceptable excuse for tardiness has been held to result in a dismissal. *In re Tampa Chain Co., Inc.*, 835 F.2d 54, 55 (2d Cir. 1987) (*per curiam*); *First National Bank v. Markoff*, 70 B.R. 264, 265 (S.D.N.Y.1987) (negligent party's appeal dismissed).

■ Unlike the situation in *Tampa Chain*, the Appellant has provided an explanation for its tardiness, albeit weak and rather late itself. The Court, in its discretion, finds that the delay in filing a brief alone is not sufficient to warrant dismissal in this case.

### B. Merits of the Appeal

■ The Appellant bases its appeal on the notion that it had a valid constructive trust claim concerning its $2 million payment to Group. A constructive trust arises "if a party 'clothed with some fiduciary character' holds legal title to property which, equitably viewed, he ought not to hold because of fraud, duress, abuse of confidence, commission of wrong, or any form of unconscionable conduct." *In the Matter of U.S.N. Co., Inc.*, 32 B.R. 675, 677–78 (Bankr.S.D.N.Y.1983) (citation omitted).[2] Such a trust is a fiction imposed as

an equitable device for achieving justice. *Commodities Futures Trading Commission v. Commercial Petrolera International, S.A.*, No. 80 Civ. 0689, slip op. (S.D.N.Y. April 12, 1982) (Knapp, J.).

The Appellant's so-called deposit was not more than an ordinary payment of earnest money on account of a purchase of property which was the debt and equity of a petroleum corporation. The letter agreement expressing the contractual arrangement called for a down-payment, the so-called deposit, against the purchase price. The agreement made no requirement that the payment be segregated, trusteed, escrowed or otherwise be specially identified or separated in the seller's account or placed with anyone else for safekeeping or at interest. The letter agreement specifically provided that the Appellant's payment was to be nonrefundable, except in limited circumstances, in consideration of Group "foregoing [substantial other] opportunities." Letter Agreement at ¶ 4. In short, there was no fiduciary arrangement contemplated or arranged.

"If the relationship is not of a confidential or fiduciary nature, so 'pregnant with opportunity for abuse and unfairness' as to require equity to intervene and scrutinize the transaction, a constructive trust cannot be imposed." *Rochester Radiology Assoc. v. Aetna Life Insurance*, 616 F.Supp. 985, 989 (W.D.N.Y.1985) (citing *Bontecou v. Goldman*, 103 A.D.2d 732, 733, 477 N.Y.S.2d 192 (2d Dept.1984)) (construing relationship between insurance company and policyholders). " 'Parties may assuredly deal at arm's length for their mutual benefit without raising a confidential relationship between them.' " *In re W.T. Grant Co.*, 4 B.R. 53, 75 (Bankr.S.D.N.Y. 1980) (discussing relationship of debtor and creditor as basis for equitable subordination) (citing *Rader v. Boyd*, 252 F.2d 585, 587 (10th Cir.1957)), *aff'd*, 20 B.R. 186 (S.D.N.Y.1982), *aff'd*, 699 F.2d 599 (2d Cir.), *cert. denied sub nom., Cosoff v. Rodman*,

---

**2.** Specifically, the following elements must be satisfied to establish a constructive trust: "(1) the existence of a confidential or fiduciary relationship, (2) the making of a promise, (3) a transfer in reliance on the promise, (4) unjust enrichment." *Hutton v. Klabal*, 726 F.Supp. 67, 73 (S.D.N.Y.1989) (citing *Sharp v. Kosmalski*, 40 N.Y.2d 119, 386 N.Y.S.2d 72, 75, 351 N.E.2d 721, 724 (1976)).

464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

 Assuming, arguendo, that theoretically some semblance of trust character is to be considered under the facts shown, the party asserting existence of a constructive trust bears the burden of demonstrating that a trust *res* exists. *In the Matter of U.S.N.*, 32 B.R. at 676. Such a showing is made more difficult when the *res* is money, rather than a tangible object, as when money has been added to an account containing other non-trust funds. In such instances, the purported *res* must be specifically traced in the bank account.

The rule of tracing the trust *res* when it has been deposited into a commingled account is well established. The seminal case on this subject holds that,

> If a trustee mingles the trust funds with the mass of his other funds, as long as there remains on hand a sufficient sum to cover the amount of the trust fund, the cestui que trust may follow the trust fund and reclaim it ... There can be no recovery, however, where all that can be shown is enrichment of the trustee. *It must be clearly traced and identified in specific property* ... It is insufficient to show that trust property went into the general estate and increased the amount and the value thereof ... *To recover, the funds must be traced into the estate and there now be found.*

*Salisbury Inv. Co. v. Irving Trust Co. (In re United Cigar Stores Co.)*, 70 F.2d 313, 316 (2d Cir.1934) (emphasis added).

"It is hornbook law that before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property into a product in the hands of the wrongdoer." *United States v. Benitez*, 779 F.2d 135, 140 (2d Cir.1985).

 The fact that the alleged *res* has been mingled with other funds in an account does not prevent tracing, *see In re Martin Fein & Co.*, 43 B.R. 623, 627 (Bankr.S.D.N.Y.1984), but it requires the court to adopt a special procedure to determine which of the fungible funds in the account are traceable as part of the alleged trust *res*. When a bankrupt debtor is acting as trustee of a constructive trust and money held in trust has been commingled with other funds, the so-called "intermediate balance rule" may be applied to determine how much money the beneficiary can actually recover. This is a legal fiction to deal with the problem of identification and to prevent subsequent additions to the fund by other creditors from being used in satisfaction of the constructive trust.

> The bankruptcy court will follow the trust funds and decree restitution where the amount of the deposit has at all times since the intermingling of funds equaled or exceeded the amount of the trust funds. But where, after the appropriation and mingling, all of the moneys are withdrawn, the equity of the cestui is lost, although moneys from other sources are subsequently deposited in the same account. In the intermediate case where the account is reduced to a smaller sum than the trust fund, the latter must be regarded as dissipated, except as to the balance, and funds subsequently added from other sources cannot be subjected to the equitable claim of the cestui que trust. If new money is deposited before the balance is reduced, the reduction should be considered to be from the new money and not from the monies held in trust.

4 King, *Collier on Bankruptcy* ¶ 541.13, at 541–79–541–80 (15th ed. 1992); *In re U.S. Lines, Inc.*, 79 B.R. 542, 545 (Bankr. S.D.N.Y.1987).

 Despite the weight of authority supporting the intermediate balance rule, and the Appellant's acknowledgement that the rule applies here, the Appellant argues that the rule need not come into play if the sum total of all of the *assets* of a debtor's estate does not fall below the amount of the alleged constructive trust. The Appellant asserts that the total assets of the debtor's estate exceeded the monetary value of the alleged *res* and states that Group "stipulated" that the totality of its assets never dropped below the amount of the *res*. "[T]hat stipulation obviated the need for any further 'tracing,'" the Appellant claims. (Appellant's Br. at 13).

Group has denied any such stipulation with relation to its bank accounts, and contends that the value of the estate's total assets is irrelevant. In *Salisbury* itself, the Court noted that,

> The bankrupt's accounts appear to have been active. There might have been a reduction of each of these accounts in turn to practically nothing, and yet the aggregate be above the alleged trust fund amount at all times. To recover, the funds must be traced into the estate and there now be found ... There is no evidence that the trust fund has remained intact during the period of the trustee's possession.

*Salisbury*, 70 F.2d at 316.

The Appellant, try as it might, cannot circumvent the intermediate balance rule. Regardless of the amount of money in all other Drexel accounts, the funds *must be traced* into the bank accounts of the entity which made the sale and *there now be found.* After Group's principal account balance dropped below $0 in January 1990, when the intermediate balance would have been measured, the earnest money payment could no longer be found there. Although the dispute could have ended with the acknowledgment of that fact, Bankruptcy Judge Conrad permitted additional discovery of all of Group's accounts, and even of the outflow from Group accounts. The Appellant was still unable to trace its money.

Since the balance in the primary Group bank account dropped below $0 before the bankruptcy, the Appellant sought to go beyond the Group accounts to accounts of associated but independent subsidiary corporations in order to find its money. No evidence was adduced or suggestion made by the Appellant that there are any alter egos involved.

Bankruptcy Judge Conrad succinctly stated at the hearing below on the evidence in the record that, "I just don't see how you can also as a matter of law you can even have a constructive trust now being imposed on the [other] Drexel subsidiaries, when these funds were passed as a normal part of their operations."

█ The law is clear that as a significant corollary to the tracing and intermediate balance rules, if the funds in the commingled account are completely dissipated, there is no *res* to discover. *Schuyler v. Littlefield*, 232 U.S. 707, 710, 34 S.Ct. 466, 466–67, 58 L.Ed. 806 (1914) ("where one has deposited trust funds in his individual bank account, and the mingled fund is at any time wholly depleted, the trust fund is thereby dissipated, and cannot be treated as reappearing in sums subsequently deposited to the credit of the same account"). When a fund has been exhausted, there can be nothing to identify in it. *Maged v. Bank of United States*, 234 A.D. 295, 254 N.Y.S. 569, 571 (2d Dept.), *aff'd*, 259 N.Y. 631, 182 N.E. 211 (1932); *Bickford's Inc. v. Broderick*, 234 A.D. 417, 255 N.Y.S. 241, 243 (1st Dept.), *aff'd*, 259 N.Y. 630, 182 N.E. 211 (1932).

"The *generally adopted* view denies the remedy of tracing where the proof of the beneficiary-claimant merely shows the receipt of trust property by the defendant and makes no case as to its subsequent history or its existence among the present assets of the defendant, and *also where the evidence shows that the trust property has been disposed of in such a way as to leave no product.*" 14 Bogert, *Trusts and Trustees* § 921 at 367–69 (2d ed. rev. 1982 & Supp.1991) (emphasis added).

█ The Appellant flatly conceded on the argument of the appeal, in response to the Court's question, that "the balance of the Group Account not only dropped below $2 million after the deposit, but below $0 on January 16, 1990."

Thus, the Appellant's deposit into the Group account having "disappeared" when the account dwindled to nothing, under the view generally adopted, the tracing had to stop.

█ The Appellant, however, cites to a number of cases that allegedly support the notion of tracing funds to wherever they might be "found," in whomever's hands, in whatever form. For example, the Appellant cites to *In re Mahan & Rowsey, Inc.*, 817 F.2d 682 (10th Cir.1987). In that case, however, the funds were traced to two

commingled accounts of the same debtor, not to accounts of independent subsidiaries or other separate entities related to the debtor, as in this case. The Appellant also cites to Collier. The only phrase in the page cited which could arguably support the Appellant's proposition is that a cestui que trust "must identify the trust fund or property in the estate, and, if such fund or property has been mingled with the general property of the debtor, sufficiently trace the trust property." *Collier* at ¶ 541.13, 541–79. This does not appear to permit the leap that the Appellant urges.

The Appellant further quotes a passage from a Supreme Court case which discusses the possible remedies for defrauded lenders in the original Ponzi scheme: "They could have followed the money wherever they could trace it and have asserted possession of it on the ground that there was a *resulting trust* in their favor, or they could have established a lien ..." *Cunningham v. Brown*, 265 U.S. 1, 11, 44 S.Ct. 424, 426, 68 L.Ed. 873 (1924) (emphasis added). However, the Court went on to say that since the money deposited in Ponzi's bank account had been exhausted, "it is impossible to trace into the Hanover deposit of Ponzi after August 1st, from which defendants' checks were paid, the money which they paid him into that account before July 26th. There was, therefore, no money coming from them upon which a constructive trust ... could be fastened." *Id.* Ponzi had already withdrawn the amount of their deposits and "had exhausted all that was traceable to their deposits." *Id.* at 12, 44 S.Ct. at 427. The Supreme Court found that the defrauded individuals were merely creditors.

The fact that trust property "can be identified 'in its original or substituted form,'" *First Federal of Michigan v. Barrow*, 878 F.2d 912, 915 (6th Cir.1989); *Baxter House, Inc. v. Rosen*, 27 A.D.2d 258, 263, 278 N.Y.S.2d 442 (2d Dept.1967), as the Appellant asserts, is neither surprising nor contrary to Group's argument. If Group had taken the Appellant's deposit and used it to buy a cow, Appellant could trace the trust *res* to the cow *in Group's hands*. That is a far cry from what Appellant seeks.

The Appellant seeks to make much of the fact that the head of the affiliated but independent Drexel Burnham Lambert Inc. ("Inc.") money desk stated in an affidavit that some money was moved around Drexel entities daily in ordinary course for ordinary business purposes. Since these were other Drexel titled entities, and possibly not bona fide purchasers for value, the Appellant believes that the *res* can be traced into their hands as is commonly done when tangible objects are converted and resold. *See, e.g., Restatement (First) of Restitution* § 204 illus. 1 (1962).

Group responds that the brief statement by the "Inc." money manager does not support the Appellant's claims that vast funds were shuffled back and forth by Group. The Appellant does not claim that these other Drexel titled entities took the money with notice of a constructive trust claim that had not yet been made. These Drexel titled entities are not parties to the action in any case.

Most significantly, Group responds that the Appellant has not made any showing that would enable it to pierce any corporate veils and treat related entities as alter egos of Group. The Appellant neither made a showing that the subsidiaries were shells over which Group exercised complete dominion, *American Protein v. A.B. Volvo*, 844 F.2d 56, 59–60 (2d Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988); *Itel Containers v. Atlanttrafik Exp. Service Ltd*, 909 F.2d 698, 703 (2d Cir.1990); *Electronic Switching Industries, Inc. v. Faradyne Electronics Corp.*, 833 F.2d 418, 424 (2d Cir.1987); *W.L. Green Industries, Inc. v. Western Intertrading, Ltd.*, No. 89 Civ. 1864 (CHT), 1992 WL 122785, at *10, 1992 U.S.Dist. LEXIS 7697, at *30–31 (S.D.N.Y. May 27, 1992), *Port Chester Elec. Constr. Corp. v. Atlas*, 40 N.Y.2d 652, 656–57, 389 N.Y.S.2d 327, 331, 357 N.E.2d 983, 987 (1976), nor that Group had so conducted business operations with Drexel titled subsidiaries to commit a wrong or fraud. *American Protein*, 844 F.2d at 59–60; *Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 853 (2d Cir. 1985). The Appellant could not and does not assert that the Drexel titled subsid-

iaries had anything to do with the circumstances giving rise to the alleged constructive trust.

Finally, as refutation to the Appellant's argument regarding gratuitous transfers to subsidiaries, this Court can look by analogy to the case in which a trustee uses trust funds to pay its own creditors,

> it would seem evident that there should not be tracing, since the result of the transaction is negative; it relieves the trustee from a burden but does not produce any property which could be said to be a substitute for, or product of, the trust funds which were misappropriated. This view has met with the approval of many well-reasoned decisions and tracing has been denied.

Bogert, *Trusts and Trustees* § 922, at 374 (footnote omitted). A counterargument has been rejected in New York. *See Bickford's* and *Maged, supra.*

In this case, Group notes that "in all the transactions where Majutama purported to trace transfers from Group to third party transferees, Group received no hard assets in exchange. Those payments by Group merely satisfied debts which Group itself owed or for which it had assumed the obligation to deliver payment."

The motion to dismiss the appeal as untimely is denied; the Bankruptcy Court's decision granting summary judgment in Group's favor is affirmed.

SO ORDERED.