**In re MUSHROOM TRANSPORTATION COMPANY, INC., et al., Debtors.**

**Jeoffrey L. BURTCH, Trustee, Plaintiff,**

v.

**HYDRAQUIP, INC. et al., Defendants.**

**Bankruptcy No. 85–02575.**
**Adversary No. 94–1004.**

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Nov. 12, 1998.

Kent Cprek, Magdeline D. Coleman, Linda S. Fossi, Sagot, Jennings & Sigmond, Philadelphia, PA.

Thomas B. Fiddler, Ledgewood Law Firm, Philadelphia, PA.

Richard L. Hahn, Bala Cynwyd, PA.

## MEMORANDUM OPINION

BRUCE FOX, Bankruptcy Judge.

The chapter 7 trustee of the consolidated entities known as Mushroom Transportation, Jeoffrey L. Burtch, has brought suit against a number of defendants including Fidelity Bank,[1] A–1 Discount Company, A–1 Discount Pension Plan,[2] and A–1 Discount Company Profit Sharing Plan. In his complaint, the trustee asserts that these four defendants received the proceeds of property stolen from the estate of Mushroom Transportation by former counsel to the debtor, Jonathan Ganz. Further, the trustee averred that these four defendants "knew or reasonably should have known that the monies received" by them from Mr. Ganz did not belong to him. Complaint, ¶ 31. The trustee claimed that he was entitled to judgment against Fidelity Bank in the amount of $23,135.33 (plus interest, "lost opportunity costs" and "profits"). From one or more of the A–1 defendants, the trustee demanded judgment in the amount of $62,241.00 (plus interest, "lost opportunity costs" and "profits"). His complaint sought this monetary relief in four separate counts: two in common law—conversion and constructive trust; and two statutory claims—turnover (under 11 U.S.C. § 542 or 543) and "unauthorized transfer" pursuant to 11 U.S.C. §§ 549, 550.

In their opposition to the trustee's claims, the four defendants asserted that they had

---

1. First Union Bank is successor in interest to defendant Fidelity Bank. For ease of reference, the defendant will be referred to as Fidelity.

2. The A–1 defendants argue that there is no entity known as A–1 Discount Pension Plan. It appears to me that the trustee seeks but one recovery from the A–1 defendants and treats them as one entity. As I conclude below that no recovery from the A–1 defendants has been proven, I need not consider whether there are only two A–1 entities rather than three; nor need I address whether liability against more than one would have been warranted.

lent money to Mr. Ganz, they had been properly repaid by him, and there was no evidence that he had repaid them with money stolen from Mushroom Transportation. Further, Fidelity argued at trial that if it had been repaid with stolen money, it neither knew nor should have known of this fact and so were entitled to be treated as a good faith transferee who received the property for fair value. The A–1 defendants agree and argue as an affirmative defense that the statute of limitations had run on all four claims raised by the trustee.[3]

Trial was held in the above-captioned adversary proceeding on May 7, 1998 against these four defendants.[4] Based upon the evidence presented, all the defendants now maintain that as to each of the four counts in the complaint, the plaintiff either cannot meet his burden of proof or, in the alternative, that the defendants have proven valid affirmative defenses. The parties have had the opportunity to submit post-trial memoranda, and the issues presented are ready for disposition.

## I.

This consolidated bankruptcy estate has experienced a somewhat convoluted existence. While I need not describe in complete detail the bankruptcy case's history, for clarity I shall provide some pertinent historical background.

This proceeding arises from the theft of estate funds by former bankruptcy counsel to the chapter 11 debtors: Mr. Jonathan Ganz. The actions of Mr. Ganz spanned a number of years and were not limited to the Mushroom bankruptcy cases. *See, e.g., In re Summit Airlines, Inc.,* 160 B.R. 911 (Bankr. E.D.Pa.1993). The thefts from the Mush-

room estate occurred while the debtors were chapter 11 debtors in possession. After conversion of these cases from chapter 11 to chapter 7, the first Mushroom trustee (who was elected by creditors under section 702), Mr. Michael Arnold, initiated at least four adversary proceedings raising numerous claims to recover the stolen funds and involving many defendants, including Mr. Ganz.

To further complicate matters and delay resolution of the various proceedings, Mr. Arnold was later convicted of embezzlement of Mushroom estate funds and removed as the bankruptcy trustee. *See* 11 U.S.C. § 324. Jeoffrey Burtch, Esquire, was then chosen by the United States trustee to be successor trustee. He succeeded Mr. Arnold as the plaintiff in this proceeding. *See* 11 U.S.C. § 325.

As I mentioned earlier, the successor bankruptcy trustee complains that the defendants in this proceeding received from Mr. Ganz some of the funds which he stole from the Mushroom estate. While the trustee does not suggest that the defendants actually knew that they were receiving stolen funds, the trustee contends either that they should have known or that their lack of knowledge was irrelevant.

In the trustee's view, parties that receive consideration for outstanding obligations have a duty to return that consideration if it is traceable to stolen property regardless of their knowledge of the theft. Alternatively, the trustee maintains that the defendants should have been suspicious about the source of funds because the payments were received from Mr. Ganz's personal bank account, and that Ganz individually had no obligation to defendants to tender such payments. N.T., at 183, 187. (As will be discussed below, this

---

3. Prior to the commencement of opening remarks I considered the motion of defendant Fidelity Bank to amend its answer so as to add the affirmative defenses of the statute of limitations and of laches. The plaintiff resisted the motion, arguing that it was untimely and prejudicial. I agreed, orally denied the motion, and memorialized that ruling by order dated May 7, 1998 (after the conclusion of the trial). *See* Fed.R.Bankr.P. 7015 (incorporating Fed.R.Civ.P. 15); *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1385 (3d Cir.1994); *Sun*

*Bank, N.A. v. E.F. Hutton & Co., Inc.,* 926 F.2d 1030, 1035–36 (11th Cir.1991); *Bechtel v. Robinson,* 886 F.2d 644, 652 (3d Cir.1989); *Albee Homes, Inc. v. Lutman,* 406 F.2d 11, 14 (3d Cir.1969); *Elf Atochem North America, Inc. v. United States,* 161 F.R.D. 300 (E.D.Pa.1995); J.Moore, *Moore's Federal Practice,* ¶ 15.15 (3d ed.1997).

4. The evidence involving these named defendants was heard on a consolidated record, by agreement of the parties.

assertion is incorrect. From the evidence presented, it is likely that Mr. Ganz was legally obligated to repay both Fidelity and A–1.)

■ In its posttrial submission, defendant Fidelity asserts that the trustee "abandoned his causes of action for the imposition of a constructive trust and for turnover under 11 U.S.C. § 542 and 543 by not addressing those claims in opening statement." Fidelity's Proposed Conclusions of Law, at 6, ¶ 3. This defendant argues that before me are only the trustee's claims that he is entitled to recover under a common law conversion theory, count I of the complaint, and pursuant to 11 U.S.C. § 549, count IV.

I recognize that plaintiff counsel's opening remarks at trial, to which the defendant refers in support of this assertion, does reflect that she referred to only these two theories of recovery. N.T. at 11. Moreover, counsel for Fidelity stated his understanding in closing remarks that the plaintiff was proceeding under these two causes of action; plaintiff's counsel did not take exception to this characterization of her case. N.T., at 155.

However, in his posttrial pleading the plaintiff does argue his right to recover pursuant to counts II and III of the complaint. See "Plaintiffs' [sic] Proposed Post–Trial Findings of Fact and conclusions of Law," at 22, ¶ 28. While it is certainly possible for a plaintiff to withdraw certain bases for recovery at trial during opening statements, see, e.g., Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339 (2d Cir. 1994), I shall not conclude that the plaintiff has done so in the instant case.

The posttrial submission of the plaintiff is sufficiently clear that the plaintiff did not intend to abandon these two causes of action. Further, the four claims are sufficiently similar factually and legally that Fidelity can point to no evidence that it would have offered had plaintiff's counsel referred directly to all four claims in her opening remarks, rather than two. Therefore, I shall address the trustee's entitlement to relief under all four claims referred to in his complaint. See Edelman v. National Bank of Washington, 297 F.2d 188, 190 (D.C.Cir.1961) (trial court wrongfully dismissed cause of action, even though "[p]laintiff's counsel is not entirely without some blame for the view which the District Court adopted since his statements concerning the theory of his case were not models of clarity").

## II.

After trial held with the participation of the four above-named defendants, and after a careful examination of both the evidentiary record and the arguments of counsel, I make the following findings of fact.[5]

1. Mushroom Transportation Company and its related entities—Robbey Realty, Inc., Penn York Realty Co., Inc., Leazit, Inc. and Trux Enterprises, Inc.—filed for bankruptcy protection under chapter 11 in June 1985.

2. The debtors in possession engaged Jonathan Ganz of the law firm of Pincus, Verlin, Hahn & Reich, P.C. to represent them in their reorganization bankruptcies.

3. The debtors' reorganization efforts quickly evolved into the orderly liquidation of assets, which assets included real property and personal property, including vehicles and receivables.

4. In either 1991 or 1992, it came to the attention of the United States Justice Department that Mr. Ganz had embezzled funds from a number of bankruptcy estates. The Department of Justice began an investigation of those thefts.

5. Included in the investigation was an audit of various bank accounts belonging to Mr. Ganz. This audit, which was included in a report prepared for and submitted in Mr. Ganz's criminal trial, reflected the theft of funds from possibly nineteen bankruptcy es-

---

5. I shall take judicial notice of the docket entries of these bankruptcy cases. Federal Rule of Evidence 201, incorporated in these proceedings by Bankr.R. 9017. See Maritime Elec., Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1200 n. 3 (3d Cir.1991); Levine v. Egidi, 1993 WL 69146, at *2 (N.D.Ill.1993); In re Paolino, 1991 WL 284107, at *12 n. 19 (Bankr.E.D.Pa.1991); see generally In re Indian Palms Associates, Ltd., 61 F.3d 197 (3d Cir.1995).

tates and which may total as much as $2,337,-892.48. Ex. P–1, at 3328.[6]

6. Among the bankruptcy estates looted by Mr. Ganz was the estate of Mushroom Transportation. As reported in the Justice Department audit:

On June 25, 1985, Mushroom Transportation Co., Inc., Trux Enterprises, Inc., Penn York Co., and Robbey Realty, Inc. filed for relief under chapter 11 and shortly thereafter an order was entered that these cases be jointly administered.[7]

The debtor ceased operations on January 10, 1986, and began liquidation of its assets with court approval. Since the Continental Bank was a secured creditor and had a lien on all of the debtor's assets, the proceeds from the sale of assets were remitted to the bank and applied to reduce their debt. Upon payment of the debt to Continental Bank, the balance of $966,624.49 was turned over to debtor's counsel, Pincus, Verlin, Hahn & Reich, P.C., c/o Jonathan H. Ganz.

Upon the receipt of the $966,624.49 from the Continental Bank, Ganz made payments of $196,894.46 for court-approved professional fees in the Mushroom Transportation Co., Inc. bankruptcy case. Another $200,000.00 was invested in a certificate of deposit at the Liberty Bank which matured on February 7, 1989 in the amount of $214,701.87. The proceeds from the certificate were deposited into another bank account entitled Mushroom Transportation—Debtor in Possession at the Provident Bank. The records of this account were not received at the time of this report and, therefore, these funds could not be verified as being misappropriated. The audit team was able to verify that $569,940.07 of Mushroom Transportation estate funds were transferred to Jonathan Ganz's personal checking account and the

funds spent for his personal use. The following is a chronological explanation of how the funds were misappropriated to his personal account.

Ex. P–1, at 3526.

7. The investigatory report, Ex. P–1, then notes the following transfers of Mushroom funds by Ganz:

First, on June 21, 1987, a treasurer's check for $200,000.00 was made payable to Mr. Ganz as counsel for the debtor in possession. This check was deposited into "his personal checking account # 069–454–7 at the Fidelity Bank on 7/28/87."

Second, on August 3, 1987, Continental transferred the balance on hand—$766,-624.69—into a new Continental Bank account in the name of "Mushroom Transportation Co., Inc. by Jonathan H. Ganz -Escrow Agent," account # 104–016361–8.

Third, on March 3, 1988, Mr. Ganz withdrew $200,000.00 from this account and deposited these funds into "his personal checking account # 069–454–7 at the Fidelity Bank on 3/4/88."

Fourth, on April 13, 1988, the above-mentioned Continental Bank account # 104–016361–8 was closed upon the withdrawal by Mr. Ganz of $169,940.07. These funds were deposited by him into "his personal checking account # 069–454–7 at the Fidelity Bank on 4/26/88."

Ex. P–1, at 3527.

8. Although Mr. Ganz gained access to more than $900,000.00 of Mushroom funds, the report makes clear that not all of these funds were misappropriated by him. Some funds were paid by him to court-approved professionals after fees were allowed in their favor. Other funds were deposited into bank accounts owned by Mushroom and possibly used for legitimate purposes by the debtor.

---

**6.** Exhibit P–1 was admitted at trial over the defendants' objections, pursuant to Fed.R.Evid 803(8)(C), for reasons stated in open court, and which shall not be repeated. *See* N.T., at 85–89.

**7.** Joint administration is permitted by Fed.R.Bankr.P. 1015(b) and is quite different from substantive consolidation. The former is merely an administrative convenience so that a party

need not file identical pleadings in five different bankruptcy cases. The latter combines the assets and liabilities of the different bankruptcy cases into one case. *See generally, e.g., In re Deltacorp, Inc.,* 179 B.R. 773, 777 (Bankr.S.D.N.Y.1995). The five Mushroom related cases were substantively consolidated by order dated January 6, 1992.

The audit report verifies only that the sum of $569,940.07 of Mushroom funds was embezzled by Mr. Ganz over time. Ex. P–1, at 3526.

9. The Justice Department report, Ex. P–1, traced the embezzled Mushroom funds as deposited by Mr. Ganz into a bank account maintained by him at Fidelity Bank—account # 0694547. Ex. P–1 contains a "reconstruction" of this account from the period June 4, 1986 through October 10, 1989. *Id.*, at 3569–3602.

10. Mr. Ganz also deposited funds into this Fidelity bank account from sources other than Mushroom Transportation. Some of these sources were clearly legitimate. For example, he deposited fees payable to him from various clients. He deposited the proceeds of assets sold by him. Other sources of deposit were not legitimate; Mr. Ganz deposited the embezzled funds from bankruptcy cases distinct from Mushroom Transportation into this Fidelity account. Ex. P–1 contains columns in which the Justice Department verified the sources of many of the deposits into this Fidelity bank account. Each source which constituted embezzled funds is so denoted.

11. In 1985 or 1986, Mr. Ganz borrowed $60,000.00 from defendant A–1 Discount Company Profit Sharing Plan in order to make a payment due under a divorce settlement. N.T., at 98. He planned to repay the loan from the proceeds of the sale of his home. *Id.*[8] The A–1 defendants were not creditors of the Mushroom entities. Ex. Fidelity–1.

12. This loan was evidenced by a note and involved quarterly interest payments. N.T., at 97, 100.

13. Mr. Ganz sold his home and received proceeds of about $110,000.00. These proceeds were deposited into the Fidelity account on May 1, 1987. Ex. P–1, at 3579; N.T., at 101–02. After this deposit, the bank account had an approximate balance of $189,000.00. There were no embezzled funds derived from the estate of Mushroom Transportation which constituted any portion of this account balance. Ex. P–1, at 3569–3579.[9]

14. By check dated January 29, 1988, Mr. Ganz paid $60,000.00 from funds drawn on this Fidelity account to A–1 Discount Company Profit Sharing Plan. Ex. P–2.[10]

15. The bank account reconciliation located in Ex. P–1 discloses many entries for deposits and withdrawals between the dates May 1, 1987 and January 29, 1988. However, the following excerpts are relevant to this proceeding (and include all references to misappropriated funds deposited into this account during this period of time [11]):

---

**8.** I appreciate, as the trustee argues, that there was no loan document offered in evidence in support of Mr. Ganz's testimony on this point. Yet, I found nothing in the audit of the Fidelity bank account to contradict his assertion. Moreover, I found his testimony credible on this point.

**9.** In fact, there were virtually no funds derived from any improper sources. The account reconciliation reflects only about $200.00 of improper deposits as of May 1, 1997.

**10.** Ex. P–2 also contains copies of two checks issued by Mr. Ganz totaling $926.00, payable from this bank account, to A–1. One of these checks, however, refers to A–1 Pension Plan, which may be the reason that the trustee thought there was such an entity and named it as a defendant.

**11.** The plaintiff argues in his post-trial memorandum that Mr. Ganz began his thefts from the Mushroom estate by June 29, 1987, when he deposited two checks totaling $47,368.67. Plaintiff's memorandum at 5, ¶ 11. In so arguing, the trustee overlooks two aspects of this deposit which makes his assertion unpersuasive.

First, the Justice Department audit team did not identify this deposit as stolen funds on its audit report. Ex. P–1, at 3581. Not every transfer of Mushroom assets to Mr. Ganz was illegal. Second, one cannot determine how much of this deposit was derived from Mushroom and how much came from a second source. The entry of June 19th simply states "Deposit 2 Checks" and lists the two sources of funds as "Est of Mushroom and ? City Inc."

For reasons not clear to me, the trustee simply assumes that these funds were all derived from the Mushroom estate and were embezzled by Mr. Ganz. Given the care described at trial with which the Justice Department prepared Ex. P–1, it is likely that had these funds been improperly taken from the Mushroom estate, the audit team would have so identified them. Nevertheless, even if the plaintiff's assumptions were persuasive, it would not change the tracing analysis. The application of the intermediate balance rule and the first in, first out principle regarding stolen funds would yield the same sources for the

a. July 9, 1987—deposit from misappropriation of Mushroom funds of $1,056.52—creating a balance of $31,614.65

b. July 28, 1997—deposit from misappropriation of Mushroom funds of $200,000.00—creating a balance of $285,858.19

c. August 28, 1987—deposit from misappropriation of North Center Texas Railways funds of $147,963.70 [12]—creating a balance of $420,532.58

d. September 9, 1987—deposit from misappropriation of Mushroom funds of $1,359.50—creating a balance of $412,138.26

e. December 1, 1987—deposit from misappropriation of Malone Transportation funds of $1,375.00—creating a balance of $122,991.73

f. January 27, 1988—deposit of $72,000.00 from the sale of stock owned by him (N.T., at 138)—creating a balance of $211,827.00

g. February 1, 1988—payment to "A-1 Profit Sharing Plan" of $60,000.00—leaving a balance remaining of $80,236.14

16. There were no deposits made to this Fidelity bank account between January 27, 1988 and February 1, 1988. There were $71,591.26 in disbursements made during this period (excluding the $60,000.00 paid to defendant A-1).

17. To the extent that tracing presumptions applicable to commingled bank accounts are germane to this proceeding, then these presumptions are applied to Mr. Ganz's Fidelity bank account as follows: misappropriated funds were disbursed by Mr. Ganz only after legitimate funds were used; the lowest intermediate balance rule applies; and misappropriated funds were disbursed on a first in/first out basis. The application of these presumptions yields the result that on February 1, 1988, immediately before Mr. Ganz paid to defendant A-1 the sum of $60,000.00, the sources of the $140,236.14 then remaining in this account were from the estate of Malone Transportation ($1,375.00), from the estate of Mushroom Transportation ($1,359.50), and the balance from North Center Texas Railways, Inc. ($137,501.64). Furthermore, the source of the $60,000.00 payment to defendant A-1 would be traced to the funds misappropriated from North Center Texas Railways, Inc., as these funds were deposited earlier than those from Mushroom or from Malone.

18. At some point prior to 1988, U-Rent Corporation, which was in the business of leasing equipment, obtained a loan from Fidelity Bank in an amount estimated to be between $150,000.00 and $250,000.00. N.T., at 110–111; 124. Fidelity Bank was not a creditor of the Mushroom entities. Ex. Fidelity-1; N.T., at 126.

19. Mr. Ganz was a shareholder of U-Rent and he and his wife guaranteed repayment of this loan. N.T., at 112 –113, 124.[13]

20. The Fidelity loan was secured by the equipment and receivables of U-Rent, as well as by certain shares of stock owned by Mr. Ganz. N.T., at 113.

$140,236.14 on hand on February 1, 1988, as set out in finding of fact # 17, whether or not Mr. Ganz had deposited $47,368.67 of funds stolen from Mushroom on June 29, 1987.

**12.** Mr. Ganz testified that he returned these funds within days of receiving them. N.T., at 129–130. However, this testimony is not credible, as there is no disbursement of such sums from this account, either shortly after the deposit or at any time thereafter. The plaintiff offered testimony of a witness who supervised the preparation of the report and who provided information concerning the persons who prepared exhibit P-1, and the methods they used to verify the data included. Each entry had at least one documentary source. N.T., at 71. Therefore, I accept that the deposit from the estate of North Central Texas Railway, Inc. was not authorized and do not find Mr. Ganz's contrary statements credible on this point. Indeed, the trustee takes the same position in his posttrial submission. Plaintiffs' [sic] Proposed Post-Trial Findings ... at 6, ¶ 13.

**13.** I find Mr. Ganz's testimony on this point credible. First, there are entries in the Fidelity account audit report that are consistent with such a loan guarantee. For example, there are entries for every month beginning in August, 1988 through January, 1989 in which checks are made payable by Mr. Ganz to Fidelity Bank on behalf of U-Rent. Indeed, the challenged Fidelity Bank payment on December 20, 1988 even refers to a U-Rent loan number. Second, it is likely that a substantial bank loan to U-Rent would require guarantees by individual shareholders.

21. U–Rent defaulted upon repayment of this loan. N.T., at 124. Fidelity then liquidated its collateral, including the shares pledged by Mr. Ganz. *Id.*

22. In addition, by a check dated December 20, 1988, and drawn on the above-mentioned Fidelity Bank account, Mr. Ganz paid to Fidelity the sum of $23,135.33. Ex. P–6; Ex. P–1, at 3598. This payment was made in connection with the loan guarantee given by Mr. Ganz. N.T., at 124–25, 133.

23. The bank account reconciliation located in Ex. P–1 discloses many entries for deposits and withdrawals between the dates July 19, 1988 and December 20, 1988. However, the following entries are relevant to this proceeding (and include all misappropriated funds deposited into this account during this period of time):

a. July 19, 1988—deposit from misappropriated funds of Wicaco Machine Corp. of $46,679.94—creating a balance of $214,086.09

b. September 26, 1988—deposit from misappropriated funds of Wicaco Machine Corp. of $5,044.33—creating a balance of $90,717.18

c. October 27, 1988—deposit from misappropriation of funds from the estate of L.K. Lobron in the amount of $21,104.87—creating a balance of $59,592.23

d. November 14, 1988—deposit from Horizon Financial of $43,537.20—creating a balance of $96,107.53

e. November 25, 1988—payment to "Alan S.C? & " of $1,000.00—leaving a balance of $18,120.46

f. December 9, 1988—deposit from Douglas H. Weiss of $26,000.00—creating a balance of $50,540.36

g. December 20, 1988—payment to Jerome Verlin of $250.00—leaving a balance of $35,462.43

h. December 20, 1988—payment to Fidelity Bank of $23,135.33—leaving a balance of $12,327.10

Ex. P–1, at 3592–3598.

24. To the extent that tracing presumptions applicable to commingled bank accounts are germane to this proceeding, then these presumptions are applied to Mr. Ganz's Fidelity bank account as follows: misappropriated funds were disbursed by Mr. Ganz only after legitimate funds were used; the lowest intermediate balance rule applies; and misappropriated funds were disbursed on a first in/first out basis. The application of these presumptions yields the result that on December 20, 1988, the funds on hand used to repay Fidelity Bank would be derived from the estate of L.K. Lobron ($21,104.87) and from the estate of Wicaco Machine Corp. ($14,357.56). No Mushroom funds would be traceable to this payment.

25. The Fidelity account # 0694547 was closed on October 10, 1989 when the last of its funds was disbursed. Ex. P–1, at 3602.

26. There was no evidence that either the A–1 defendants or defendant Fidelity Bank had reason to suspect that the source of the payments received by them were from funds stolen by Mr. Ganz.

27. There was no evidence that either the A–1 defendants or defendant Fidelity Bank retained possession of the funds transferred to them by Mr. Ganz at the time this adversary proceeding commenced.

### III.

I reach the following legal conclusions in this proceeding.

1. Pennsylvania law would determine whether the proceeds of funds stolen from the Mushroom estate were transferred to defendants.

2. Pennsylvania law would determine whether the plaintiff has proven a cause of action under conversion or constructive trust.

3. In order to demonstrate a valid statutory claim under turnover or improper transfer, as well as valid common law claims for conversion or constructive trust against these defendants, the plaintiff must trace the proceeds of funds stolen from the consolidated Mushroom estate to the defendants.

4. Even if proceeds of stolen funds from Mushroom are traceable to the defendants, the plaintiff cannot prevail if the defendants received these proceeds for fair value and

neither knew or should have known of their illegal origins.

5. Pennsylvania applies the tracing presumption of the intermediate balance rule to commingled trust funds in a bank account. It also applies the presumption of first-in/first-out when there are only trust funds in a bank account.

6. The plaintiff did not demonstrate that proceeds of Mushroom property were transferred to any of these four defendants.

7. The evidence shows that these defendants received payments from Mr. Ganz for fair value and neither knew nor should have known that the source of the payments was stolen property.

## IV.

### A.

■ The four causes of action stated against the defendants have a common evidentiary element: each of them requires a showing that the proceeds of funds stolen from the now consolidated estate of Mushroom Transportation were paid to the defendants. That is, the plaintiff here cannot prevail unless he can establish that the proceeds of estate funds from the debtor were transferred by Mr. Ganz to the defendants. This is as true for the federal statutory causes here alleged, 11 U.S.C. § 549(a); 11 U.S.C. §§ 542 and 543, as it is for the common law theories of conversion and constructive trust. *See generally, e.g., In re Gray Electric Co.*, 142 F.3d 433 [Table], 1998 WL 109989, * 1 (6th Cir.1998) ("the critical question [under § 549 is]... whether the transferred funds were property of the bankrupt estate"); *Western United Life Assur., Co. v. Hayden*, 64 F.3d 833, 836 n. 3 (3d Cir.1995) (noting that the debtor sought turnover under section 542, but relief was denied as the debtor had no interest in the property sought to be recovered); *First Federal of Michigan v. Barrow*, 878 F.2d 912, 915 (6th Cir.1989) (inability to trace funds precluded imposition of constructive trust for purpose of removing

funds from bankruptcy estate); *Baram v. Farugia*, 606 F.2d 42, 43–44 (3d Cir.1979) (discussing the Pennsylvania common law claim of conversion). Thus, the ability of the trustee to trace the stolen funds of the Mushroom bankruptcy estate into the possession of the defendants is an initial evidentiary burden of persuasion common to all of his stated causes of action.

Here, of course, Mr. Ganz deposited the funds he stole from the Mushroom estate into his personal bank account with Fidelity Bank. These funds were then commingled with other deposits (both before and after the thefts) and used to pay a large number of individuals and entities. Many of the other deposits were derived from legitimate sources; some were derived from thefts from other bankruptcy estates.

■ Obviously, Mr. Ganz, by his embezzlement of Mushroom funds, converted property of the bankruptcy estates to his own use as a matter of Pennsylvania law. Pennsylvania law would apply in this adversary proceeding because the theft of funds arose from Pennsylvania corporations, occurred in Pennsylvania, and the misappropriated funds were deposited in Pennsylvania. *See Western United Life Assur., Co. v. Hayden*, 64 F.3d, at 837.[14] Since the proceeding here does not involve competing creditor claims to bankruptcy estate property, there are no federal bankruptcy policies which suggest that state law should be preempted. *See Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 492 (3d Cir. 1997) ("the Bankruptcy Code was written with the expectation that it would be applied in the context of state law and that federal courts are not licensed to disregard interests created by state law when that course is not clearly required to effectuate federal interests") (quoting *Matter of Roach*, 824 F.2d 1370, 1374 (3d Cir.1987)); *see generally Atherton v. Federal Deposit Insurance Corp.*, 519 U.S. 213, 117 S.Ct. 666, 670, 136 L.Ed.2d

14. Unfortunately, the plaintiff refers to decisions from many states—*e.g.*, Oregon, Memorandum, at 15–16—without articulating which common law is applicable to this proceeding and without acknowledging that the common law of the various states differs on issues germane to this dispute.

656 (1997).[15] Thus, the bankruptcy trustee, acting on behalf of the Mushroom estate, has a claim against Mr. Ganz due to his theft of property. *See generally In re Erie Trust Co. of Erie,* 326 Pa. 198, 201, 191 A. 613 (1937).

Under state law, the bankruptcy estates, acting through the bankruptcy trustee, had the right to claim that the funds stolen by Mr. Ganz were held in trust by the thief on their behalf. *See Appeal of Mehler,* 310 Pa. 25, 28, 164 A. 619 (1932). Such a claim would prefer them to other creditors of Mr. Ganz. That is, even if Mr. Ganz were insolvent, the bankruptcy trustee could validly assert under Pennsylvania law that he should be repaid first from all funds stolen by Mr. Ganz and still in his possession, because those funds as a matter of state law were held by Mr. Ganz in trust for the Mushroom estate. *E.g., Appeal of Mehler,* 310 Pa. at 28. However, in order to prevail on any trust claim against Ganz, the bankruptcy trustee must "trace the proceeds received from the conversion and identify them as contained in some specific fund or property in possession [of the wrongdoer.]" *Id.,* at 29. If the stolen funds were no longer in the possession of Mr. Ganz when the bankruptcy trustee made demand for their return, no such recovery would be ordered and the bankruptcy trustee would hold but a general unsecured claim against Ganz for conversion.

*See Fischbach & Moore v. Philadelphia Nat. Bank,* 134 Pa.Super. 84, 3 A.2d 1011 (1939).

Were a third party to receive the converted funds from Ganz with knowledge that they were converted (either actual or presumed knowledge) then the bankruptcy trustee could recover the converted property from the third party recipient on the common law claims of conversion or constructive trust. *Accord, e.g., Pennsylvania Co. for Insurances on Lives and Granting Annuities v. Ninth Bank & Trust Co.,* 306 Pa. 148, 158 A. 251 (1932); *Solomon v. Gibson,* 419 Pa.Super. 284, 288, 615 A.2d 367 (1992).

The fact that Ganz deposited the stolen funds into a bank account does not preclude the imposition of a constructive trust being established. *See, e.g., Central Nat. Bank v. Connecticut Mut. Life Ins. Co.,* 104 U.S. 54, 66, 26 L.Ed. 693 (1881) ("If the money deposited belonged to a third person, and was held by the depositor in a fiduciary capacity, its character is not changed by being placed to his credit in his bank account"); *In re Martin Fein & Co., Inc.,* 43 B.R. 623 (Bankr.S.D.N.Y.1984). However, it is necessary that the stolen funds be traced into that particular account. *See In re Erie Trust Co. of Erie,* 326 Pa. at 201; *Appeal of Mehler,* 310 Pa. at 29:

> Where improperly converted assets of a trust estate are traced into the fund for distribution, a preference has always been allowed on the theory that such assets

---

**15.** In *Goldberg v. New Jersey Lawyers' Fund for Client Protection,* 932 F.2d 273 (3d Cir.1991), the Court of Appeals addressed completing claims made by entities who had been defrauded by the debtor against the proceeds of a bank account which had been expressly identified as a trust account. In resolving this dispute, the Third Circuit stated:

> In order to establish rights as a trust recipient, a claimant must make two showings: (1) demonstrate that the trust relationship and its legal source exist, and (2) identify and trace the trust funds if they are commingled. Whereas the first showing is generally a question of state law, the second showing "because it pertains to distribution of assets from an entity in federal bankruptcy proceeding is exclusively a question of federal law".... We rely on state law to the extent that it does not conflict with federal law.

*Id.,* at 280 (quoting *Connecticut General Life Ins. Co. v. Universal Ins. Co.,* 838 F.2d 612, 618–19 (1st Cir.1988)).

In contrast, the instant adversary proceeding does not involve competing claims against property of the estate. Rather, it involves a claim by a bankruptcy trustee against third parties who are not creditors of the debtors. Therefore, federal interests concerning the distribution of estate property to creditors would not be implicated here, and state law should be applicable. *See also In re Teltronics Ltd.,* 649 F.2d 1236, 1242 (7th Cir.1981) (applying state law as not in conflict with federal principles); *see generally In re Lady Madonna Industries, Inc.,* 76 B.R. 281 (S.D.N.Y.1987). *Compare In re Columbia Gas Systems, Inc.,* 997 F.2d 1039, 1055–57 (3d Cir. 1993) (federal common law was applicable because the question whether property transferred to the debtor for distribution as refunds to customers was property of the bankruptcy estate or held in trust implicated policies established by the federal Natural Gas Act), *cert. denied,* 510 U.S. 1110, 114 S.Ct. 1050, 127 L.Ed.2d 372 (1994).

have never become a part of those of the trustee but at all times have remained, whether in their original or substituted form, the property of the cestui que trust, and therefore the trustee's general creditors are not entitled to any share in their distribution.

The fact that Ganz commingled the stolen Mushroom funds by depositing other funds, derived from both legitimate and illegitimate sources, into this bank account does not by itself preclude the imposition of a trust. *See In re Erie Trust Co. of Erie,* 326 Pa. at 206–07; *Central Nat. Bank v. Connecticut Mut. Life Ins. Co.* However, tracing the amount of stolen funds remaining in the account at any given time involves the application of a number of common law presumptions.

■ As a general rule, in tracing the origins of funds withdrawn from a bank account, Pennsylvania applies the rule established in *Clayton's Case,* 1 Merrival 572 (Ch. 1816), that the funds first deposited are the funds first withdrawn. *City of Pittsburgh v. Rhodes,* 230 Pa. 397, 399, 79 A. 634 (1911); *Fischbach & Moore v. Philadelphia Nat. Bank,* 134 Pa.Super. at 91–92, 3 A.2d 1011 (refusing to impose a constructive trust on a bank account because the funds belonging to the plaintiff which had been deposited were withdrawn under the first-in, first out principle); *see also Empire State Surety Co. v. Carroll County,* 194 F. 593, 603 (8th Cir. 1912) ("Applying the settled rule that, in the absence of affirmative evidence to the contrary, where payments are made out of a common fund, the presumption is that the earliest in are the earliest out").

■ This principle has been modified by application of the presumptions articulated in English common law in *In re Hallett's Estate [Knatchbull v. Hallett],* 13 Ch.D. 696 (1879) when tracing funds which have been commingled by a tortfeasor into a bank account. *See Central Nat. Bank v. Connecticut Mut. Life Ins. Co.,* 104 U.S. at 68–69; *In re Erie Trust Co. of Erie,* 326 Pa. at 204.

There are two related presumptions derived from *Hallett's Estate* and accepted in Pennsylvania (and federal) common law. First, if the fiduciary (*i.e.,* tortfeasor/depositor) has a choice of withdrawing either the proceeds of trust funds or legitimate funds, then the fiduciary will withdraw the legitimate funds. *Central Nat. Bank v. Connecticut Mut. Life Ins. Co.,* 104 U.S. at 68; *In re Erie Trust of Erie,* 326 Pa. at 206; *In re Columbia Gas Systems, Inc.,* 997 F.2d at 1063. Second, once the proceeds of the trust (*i.e.,* stolen funds) are spent by the fiduciary, new deposits made are not treated as replenishing the trust proceeds. *See Appeal of Mehler,* 310 Pa. at 29; *Fischbach & Moore v. Philadelphia Nat. Bank,* 134 Pa.Super. at 91; *In re Columbia Gas Systems, Inc.,* 997 F.2d, at 1063; *see generally In re Mahan & Rowsey, Inc.,* 817 F.2d 682, 684 (10th Cir.1987).[16] Together, these two tracing presumptions are sometimes referred to as the "lowest intermediate balance" rule.

As summarized by the Third Circuit Court of Appeals:

> The lowest intermediate balance rule, a legal construct, allows trust beneficiaries to assume that trust funds are withdrawn last from a commingled account. Once trust money is removed, however, it is not replenished by subsequent deposits. Therefore, the lowest intermediate balance in a commingled account represents trust funds that have never been dissipated and which are reasonably identifiable.

*In re Columbia Gas Systems, Inc.,* 997 F.2d, at 1063; *accord, e.g., In re Mahan & Rowsey, Inc.,* 817 F.2d at 684–85; L.King, 5 *Collier on Bankruptcy,* ¶ 541.11[5] at 541–54.7 (15th ed.rev.1998):

> The situation frequently occurs where trust funds have been traced into a general bank account of the debtor. The following general principles have been applied. The bankruptcy court will follow the trust fund and decree restitution where the amount of the deposit has at all times since the inter-

---

**16.** There may be an exception to this principle when the bank account into which the later deposits are made "is explicitly labeled a trust account." *Goldberg v. New Jersey Lawyers' Fund for Client Protection,* 932 F.2d 273, 280 (3d Cir.

1991) (citing G. Bogert, *Trusts and Trustees* § 162 (6th ed.1987)). However, the Fidelity bank account in this dispute was not so identified and thus the exception would not apply.

mingling of funds equaled or exceeded the amount of the trust fund. But where, after the transfer into the bank account and mingling, all of the moneys are withdrawn, the equity of the beneficiary is lost, although moneys from other sources are ultimately deposited in the same account. In the intermediate case where the account is reduced to a smaller sum than the trust fund, the latter must be regarded as dissipated, except as to the balance, and funds subsequently added from other sources cannot be subjected to the equitable claim of the beneficiary. If new money is deposited before the balance is reduced, the reduction should be considered from the new money and not from the monies held in trust. This analysis may be referred to as the "lowest intermediate balance test."

(footnote omitted).

Counsel for the trustee in this adversary proceeding assumed at the end of the trial that certain commingled bank account presumptions, which as a matter of equity were established to resolve disputes regarding claims to property held by a tortfeasor, were applicable to the instant litigation. That is, the tracing decisions cited above generally involved disputes over claims to funds remaining on deposit in bank accounts still in the possession of the tortfeasor, rather than to claims against innocent third parties who dealt with the tortfeasor. Here, the application of the intermediate balance rule in any claim by the trustee for a constructive trust against Mr. Ganz would result in a conclusion that he no longer held any funds in trust, since his account balance reached zero on October 10, 1989—years before this litigation commenced. *See, e.g., In re Drexel Burnham Lambert Group, Inc.,* 142 B.R. 633, 638 (S.D.N.Y.1992).

 Nonetheless, if I accept plaintiff's position, *arguendo,* and apply commingled bank account tracing presumptions to this dispute, there remain two defects to his claims against these four defendants on the evidence presented.

First, the evidence does not support the bankruptcy trustee's argument that the defendants here received the proceeds of funds stolen from the Mushroom estate. Not only

does the plaintiff overlook the intermediate balance rule, but he also ignores the principle accepted in Pennsylvania that when trust funds from various estates are commingled, there is a presumption that they are treated on a "first in, first out" basis. *See Fischbach & Moore v. Philadelphia Nat. Bank,* 134 Pa.Super. at 91; *see also Empire State Surety Co. v. Carroll County:*

> Where a trustee has mingled in a common fund the moneys of many separate cestuis que trustent and then made payments out of this common fund, the legal presumption is that the moneys were paid out in the order in which they were paid in, and the cestuis que trustent are equitably entitled to any allowable preference in the inverse order of the times of their respective payments into the fund.

194 F. at 605.

Recently, the Pennsylvania Superior Court was faced with competing claims of two fraud victims to the remaining funds in a bank account of a tortfeasor who had deposited funds wrongfully obtained from both victims. Certain withdrawals had been made leaving a balance insufficient to repay both claimants. The appellate court concluded that, under Pennsylvania law (citing, *inter alia, Empire State Surety Co.* and *Fischbach & Moore* ), the funds withdrawn were derived from the first victim only based upon the "first in, first out" presumption:

> In attempting to trace funds, the rule in Pennsylvania is "first in, first out." Pursuant to this rule, "the legal presumption is that the moneys were paid out in the order which they were paid in, and [the parties claiming ownership] are equitably entitled to any allowable preference in the inverse order of the times of their respective payments into the fund." .... This rule, although criticized by some legal scholars, remains the law in Pennsylvania.

*Commonwealth Land Title Ins. Co. v. Doe,* 395 Pa.Super. 595, 601, 577 A.2d 1358 (1990), *appeal denied without op.,* 527 Pa. 666, 593 A.2d 841 (1991) (quoting *Empire State Surety Co. v. Carroll County,* 194 F. 593 (8th

Cir.1912)) (other citations omitted).[17]

In closing argument, the trustee's counsel acknowledged that stolen funds are withdrawn from a commingled bank account on a "first in, first out" basis. N.T, at 165, 167, 171. Upon my review of state law, I conclude that her position is correct. *See, e.g., Commonwealth Land Title Insurance Co. v. Doe.* Here, the government audit of Mr. Ganz's Fidelity account makes clear that, upon application of the intermediate balance rule along with the first in, first out principle for the proceeds of stolen funds, there were no Mushroom funds remaining in that account at the time of Mr. Ganz's challenged payments to these defendants. If any stolen funds were presumptively in the Fidelity account at the time the two challenged transfers were made, using the intermediate balance rule that legitimate funds were dispersed first, and then using the first in, first out principle regarding stolen funds, the proceeds of stolen funds on hand at the time of the two transfers could only have been derived from bankruptcy estates other than Mushroom; Mr. Ganz deposited the proceeds of those other thefts after he deposited the Mushroom proceeds, and the Mushroom proceeds would have been spent. (I have detailed the calculations in the findings of fact above.) [18]

**17.** I recognize that not all jurisdictions follow the tracing presumption of *Clayton's Case* when deciding how to distribute the funds still held on deposit by a tortfeasor who wrongfully deposited trust funds of several beneficiaries into one account. *See, e.g., In re Rhine,* 241 F.Supp. 86, 92–95 (D.Colo.1965) (applying Colorado law). Some courts have "distributed the funds among the victims pro rata according to their respective losses." *Ruddle v. Moore,* 411 F.2d 718 (D.C.Cir. 1969). Some look to a complicated equitable formula proffered in IV Scott, *The Law of Trusts* § 519 (4th ed.1989). *See In re Rhine,* 241 F.Supp. at 92–95. As noted above, however, Pennsylvania appears to be a jurisdiction which favors the simpler tracing presumption. I note that the "first in-first out" method of tracing bank account withdrawals has recognition within the banking community. *See In re Mark Benskin & Co., Inc.,* 135 B.R. 825, 829 (Bankr.W.D.Tenn. 1991) (both the bank manager and the accountant auditor testified that they would use the " 'first in—first out' method for tracing funds ... [as] this was the only logical method to use").

Moreover, the trustee cites to no decision which rejects the presumption of *Clayton's Case* to the recovery of payments made to third parties (as opposed to determining the disposition of funds remaining in the tortfeasor's bank account). *See Ruddle v. Moore,* 411 F.2d at 719 ("But it [*Clayton's Case*] has nothing to be said for it as a principle governing conflicting claims to restitution by equally wronged parties"). The bankruptcy trustee and the defendants here are not "equally wronged victims" filing competing claims to the remaining proceeds of the Fidelity bank account. That account has long been closed. And the defendants were not victims of Mr. Ganz's misappropriations. They are creditors of his who were repaid by him long ago. One of the legal scholars who has criticized the "first in, first out" tracing principle is Professor Scott in his treatise. IV Scott, *The Law of Trusts,* § 519 (4th ed.1989). Even if one were to apply Professor Scott's complicated formula—which is a modification of the lowest intermediate balance rule, *see In re Rhine,* 241 F.Supp. at 94—to Mr. Ganz's Fidelity bank account, the result of this application would yield the presumption that only a small fraction of the funds paid to these defendants could be traced to a deposit from the Mushroom estate. The plaintiff does not advocate the use of Professor Scott's tracing formula, so I have been offered no assistance from the parties in making the involved calculations. My quick computation, using Professor Scott's suggested tracing rule, is that at most about $4,500.00 of the $23,000.00 payment made to Fidelity Bank could be derived from funds stolen by Ganz from the Mushroom estate. I have not attempted to be more precise because even if plaintiff were to argue for such application, and even if Pennsylvania decisions would support its use, the trustee's claim would still founder on the point, to be discussed below, that the challenged payments were made to bona fide transferees for value.

**18.** Although it is not clear, the trustee's post-trial memorandum may deviate from the argument made by his counsel at trial and suggest that once Mr. Ganz deposited the proceeds of his theft from the Mushroom estates, all funds in the account paid to third parties, whenever paid, are presumptively traceable to Mushroom funds, because the victim of the theft has "a trust [claim] upon the entire" account. Plaintiff's Memorandum, at 14, ¶ 33. *See also* Plaintiff's Memorandum at 20, ¶ 41. Not only does this suggestion contravene Pennsylvania law, but it would lead to an insupportable result.

If the defendants presumptively received Mushroom funds simply because stolen funds from Mushroom were commingled with other funds—both legal and stolen from other sources—into one account, then the defendants presumptively received funds stolen from the many other bankruptcy cases in which Mr. Ganz was connected, whose proceeds were also deposited into this account. For example, by the trustee's logic, these defendants presumptively re-

Accordingly, the defendants did not receive any of the proceeds of funds stolen from the Mushroom estate. Since these four defendants never received any estate property, the trustee has no right to recover any funds paid to them based upon the four theories he has asserted. Therefore, the defendants are entitled to judgment.

### B.

Second, even if the trustee had proven that the defendants had received the proceeds of Mr. Ganz's theft from the Mushroom estates, plaintiff's claims founder on a second requirement: that any recovery be against third parties who were not bona fide transferees for value.

██ I turn first to the state common law claims.

As explained recently by the Pennsylvania Superior Court:

A cause of action for money had and received entitles a party to relief where money is wrongfully diverted from its proper use and that money subsequently falls into the hands of a third person who has not given valuable consideration for it. . . . The cause of action fails, however, where the recipient of the money has given consideration in exchange for the funds and is unaware that the money was procured by fraudulent means.

Under the *Restatement of Restitution,* the cause of action is defined as follows:

A person who, non-tortiously and without notice that another has the beneficial ownership of it, acquires property which it would not have been wrongful for him to acquire with notice of the facts and of which he is not a purchaser for value is,

upon discovery of the facts, under a duty to account to the other for the direct product of the subject matter and the value of the use to him, if any, and in addition, to

a) return the subject matter in specie, if he has it;

b) pay its value to him, if he has non-tortiously consumed it in beneficial use;

c) pay its value or what he received therefor at his election, if he has disposed of it.

*Restatement of Restitution* § 123. See also *Transamerica Insurance Company v. Long,* 318 F.Supp. 156, 160 (W.D.Pa.1970) (holding that once stolen money has been negotiated, the victim-owner, or one standing in his shoes, cannot recover a like amount from a third party recipient unless it can be proved that the recipient had prior knowledge that the money was stolen.)

*Solomon v. Gibson,* 419 Pa.Super. 284, 288–89, 615 A.2d 367 (1992) (citations omitted).

Therefore, had Fidelity Bank and the A–1 defendants received funds from Mr. Ganz which could be traced to the proceeds of funds stolen from the Mushroom estates, there is no evidence that these defendants were not bona fide purchasers for value under state law.

In *Solomon v. Gibson* a victim of a theft of property sought to recover from third parties who were earlier theft victims, and who had been paid by the thief from the assets of the plaintiff to hide his earlier misconduct. *Id.,* 419 Pa.Super. at 287. The defendants filed a demurrer [19] arguing that these facts alone were insufficient to state a cause of action against them, because the plaintiff had not alleged and could not prove both that they knew (or should have known) the funds paid

---

ceived the proceeds of funds stolen from Malone Transportation, North Center Texas Railway, L.K. Lobron, and Wicaco Machine. And if the defendants were liable to Mushroom, they would also be liable to the four other estates. Indeed, the trustee's position would seemingly create a liability against third party transferees in excess of the transfer received.

This indefensible conclusion is avoided by recognizing that the defendants can only be liable if the plaintiff can trace stolen funds paid to them. And the tracing principles outlined earlier provide a basis for determining which one of the

many victims is the source of the challenged transfer.

**19.** A demurrer in Pennsylvania is equivalent to a motion under Fed .R.Civ.P. 12(b)(6) for failure to state a cause of action. *See Satchell v. Insurance Placement Facility of Pennsylvania,* 241 Pa.Super. 287, 292, 361 A.2d 375 (1976) ("Preliminary objections in the nature of a demurrer pursuant to Rule 1017(b)(4), Pa.R.C.P., is merely an allegation by the defendant that the plaintiff's complaint has failed to state a cause of action upon which relief may be granted").

to them belonged to the plaintiff and that they did not give fair value for the receipt of such funds. The Pennsylvania Superior Court held that, under state law, the plaintiff could only state a cause of action against these defendants by proving that "money is wrongfully diverted from its proper use and that money subsequently falls into the hands of a third person who has not given valuable consideration." *Id.*, at 288. Thus, the plaintiff was obligated to plead that the defendants knew or should have known "that the money [paid to them] was procured by fraudulent means." *Id.*, at 288; *see also In re First Capital Mortg., Loan Corp.*, 917 F.2d 424, 427 (10th Cir.1990) ("Once the funds were transferred to a bona fide purchaser for value, neither the debtor nor [the trust beneficiary] had any claim to them"); *In re Drexel Burnham Lambert Group, Inc.*, 142 B.R. at 639 (applying New York law); *cf. Colonia Ins. Co. v. City Nat. Bank*, 988 F.Supp. 1242, 1253 (W.D.Ark.1997) (grants summary judgment to an employee who allegedly was paid by funds stolen by her employer where there was no evidence that she knew or should have known of the theft). In *Solomon*, the plaintiff's complaint was dismissed due to his failure to plead knowledge on the part of the defendant. *Compare Pennsylvania Co. for Insurances on Lives and Granting Annuities v. Ninth Bank & Trust Co.*, 306 Pa. 148, 158 A. 251 (1932) (defendant bank knew or should have known that the payment it received was derived from conversion).

Further, under Pennsylvania law it is well established that a tortfeasor's payments to third parties in satisfaction of antecedent debts represent fair value for the payments received. *Solomon v. Gibson*, 419 Pa.Super. at 289 ("in Pennsylvania, we have held that the cancellation of a valid pre-existing debt or other obligation constitutes value"). Since the plaintiff in *Solomon* did not plead and could not prove that the defendants did not give fair consideration for the payments received from the tortfeasor, for that additional reason, the dismissal of the complaint in that case was proper.

Similarly, under the bankruptcy trustee's federal statutory claims of turnover (section 542)[20] and improper postpetition transfer (section 549), the trustee could only sustain a claim against a third party who received the proceeds of property wrongfully taken from the estate if he could trace such property and if the third party was not a bona fide transferee.

11 U.S.C. § 550(b) expressly applies to all actions brought under section 549. An "immediate or mediate transferee" who receives a transfer of estate property for value without knowledge of any prior invalid transfer is insulated from any claim under section 549. *See, e.g., In re Video Depot, Ltd.*, 127 F.3d 1195, 1197 (9th Cir.1997):

On the other hand, the trustee may not recover from a subsequent transferee if the subsequent transferee accepted the transfer for value, in good faith, and without knowledge of the transfer's voidability. 11 U.S.C. § 550(b). Subsequent transferees therefore have a defense unavailable to initial transferees.

The purpose of this scheme is to protect creditors "from last-minute diminutions of the pool of assets in which they have interests," while at the same time to guard against "the waste that would be created if people either had to inquire how their transferors obtained their property or to accept a risk that a commercial deal would be reversed for no reason they could perceive at the time." *Bonded Fin. Servs., Inc. v. European American Bank*, 838 F.2d 890, 892 (7th Cir.1988). Section 550 balances these two goals by imposing on the initial transferee the "burden of inquiry and the risk if the conveyance is fraudulent." *Id.* While the initial transferee is in the best position to monitor the transaction, "subsequent transferees usually do not know where the assets came from and would be ineffectual monitors if they did."

Here, the defendants would be transferees of the initial transferee, Mr. Ganz, and so be entitled to such statutory protection. *See generally, e.g., id.*, at 1198–99; *Bonded Fi-*

---

**20.** Section 543 could not be applicable to this proceeding because it applies only against a "custodian," a term defined by 11 U.S.C. § 101(11). None of the definitions of custodian could apply to these four defendants.

nancial Services, Inc. v. European American Bank, 838 F.2d 890, 893 (7th Cir.1988).

An analysis of section 542 is more complex because the bankruptcy trustee is not seeking a turnover of property at the outset of a bankruptcy case from one who obtained possession of the property prepetition. *See generally United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). Rather, the trustee is seeking "turnover" from transferees who allegedly received property postpetition.

There are some courts which take the position that a turnover action may only be based upon a prepetition transfer, not a transfer which occurs after the bankruptcy case has commenced. In the latter instance, these courts hold that the only available remedy arises from section 549, which relief (as noted earlier) cannot be granted against a bona fide non-initial transferee.

> Several policies support the conclusion that [11 U.S.C.] § 549 is the exclusive means by which a trustee may attack post-petition transfers. First, it is only fair that the very broad power of the trustee under § 549 must be subject to certain definite limitations. Time is perhaps the only limitation which appears in § 549. In § 549(d) ... appears a strict two-year statute of limitations which is "keyed not to the appointment of the trustee but to the date of the transfer." *In re Sattler's, Inc.*, 73 B.R. 780, 791 (Bankr.S.D.N.Y.1987)....
>
> Secondly, adopting the Trustee's version of the interplay between § 542 and § 549 would virtually obliterate the limitation period imposed by § 549(d). According to the Trustee, whenever he finds that an action under § 549 is barred by § 549(d), he alternatively could resort to § 542,

which has no applicable statute of limitations.

*In re 31–33 Corp.*, 100 B.R. 744, 747–48 (Bankr.E.D.Pa.1989) (Scholl, B.J.); *see also In re A.J. Lane & Co., Inc.*, 167 B.R. 729, 732 (Bankr.D.Mass.1994) ("Count 8 seeks to recover the $50,000 from Hanley pursuant to section 542 of the Code, which requires a party (other than a custodian) to deliver to a trustee property in his 'possession, custody, or control during the case ... that the trustee may use, sell, or lease under section 363 of this title....' Because the property sought to be turned over was acquired as the result of a postpetition transfer, this cause of action necessarily depends upon the Trustee's ability to recover the transfer under section 549").

■ If I assume that a turnover action under section 542 may be brought to recover property transferred to a third party postpetition, the protections for bona fide purchasers detailed in section 550(b) would still apply.

I recognize that 11 U.S.C. § 542(c) was intended by Congress to provide good faith protection from turnover actions to transferors and not transferees. *See, e.g., Jones v. Harrell*, 858 F.2d 667, 670 n. 2 (11th Cir. 1988); *In re Mills*, 176 B.R. 924, 928 (D.Kan. 1994). Thus, when an entity without knowledge of the debtor's bankruptcy filing transfers property of the estate to another entity in good faith, the transferor is insulated from any turnover action by virtue of section 542(c). The transferee, however, may be subject to an action for recovery. *See, e.g., Epstein, et al., 2 Bankruptcy*, § 6–74, at 180 (1992) ("Note that section 542(c) protects only the party who transfers the property of the estate; it does not protect the transferee").[21]

---

21. The trustee implicitly argues that these four defendants should be treated as transferees and not transferors under section 542(c). However, there has been no showing in this proceeding that these defendants retained possession of the funds transferred to them by Mr. Ganz many years ago at the time this proceeding commenced. Surely, those funds were commingled with other funds of the defendants and quite possibly transferred over the years to other entities in the defendants' normal course of business. Despite the plaintiff's assertions in its post-trial memorandum, at 15, the turnover action brought

in this instance cannot succeed upon any *in rem* theory of recovering specific property from these defendants.

Further, as the defendants were not creditors of the Mushroom estates, it is arguable that they had no "actual notice or actual knowledge" of the bankruptcy filings at the time of the challenged transfers. I would anticipate the trustee's position that these defendants did have "actual notice" of the Mushroom bankruptcy filings. He would mention that an officer of the A–1 defendants was a shareholder of Mr. Ganz's law firm, friendly with him and so likely to know of his

However, Congress did not intend to impose strict liability on the transferee when the challenged transfer arose postpetition:

> Protection afforded by section 542(c) applies only to the transferor or payor and not to a transferee or payee receiving a transfer or payment, as the case may be. *Such transferee or payee is treated under section 549 and section 550 of title 11.*

124 Cong.Rec. H11097 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards); 124 Cong.Rec. S17413 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini) (emphasis added).[22]

Thus, in *In re Hill*, 156 B.R. 998 (Bankr. N.D.Ill.1993), a bankruptcy trustee brought an action to recover estate property from a third party transferee who had obtained possession postpetition in good faith and without knowledge of any inpropriety in the transfer. The transferee successfully raised the good faith defense found in section 550(b):

> The defense cannot be dodged by the ploy of only invoking section 542, and thus contending the defenses of sections 549 and 550 are therefore inapplicable. There is no statutory provision restricting use of those defenses only to actions brought under sections 549 or 550. No provision in the Code precludes use of the bona fide purchaser defense against turnover actions under section 542. The ultimate relief sought by the Trustee is to get the Property back unencumbered by Wesav's mortgage, without the cloud on title of the warranty deed to Gunn and Gunn's possession. Whether the statutory nominal relief is styled turnover under section 542, avoidance under section 549 or recovery under section 550, the end result sought is substantially the same.

*Id.*, at 1009.

In resolving the instant proceeding, I need not decide whether the trustee could state a valid turnover claim to recover a postpetition transfer. If I assume that such a claim can be made, the evidence demonstrates that these postpetition transferees, to the extent that they received any estate property, exhibited good faith in so doing.

In this proceeding there was no evidence presented to demonstrate that the four defendants involved in the instant trial received any payments from Mr. Ganz for which fair consideration was not given, or that they knew or should have known that the funds used to pay them did not belong to Mr.

---

clients. Fidelity Bank deposited checks with information disclosing the Mushroom bankruptcy. Therefore, the defendants might have known of the Mushroom bankruptcy cases.

Nevertheless, the Seventh Circuit Court of Appeals would suggest that general knowledge of a bankruptcy filing is not what Congress intended in enacting section 542(c):

> If we are right that subsection (a) imposes on the possessor a legal duty to deliver up the value of the property that he possessed even if he no longer possesses it, the draftsmen could not have intended that knowledge of the bankruptcy alone would trigger the duty. (Maybe the bankruptcy had been widely publicized, so that everyone in the financial and legal community knew about it.) For then persons connected with a bankrupt would become financial lepers, unable to engage in any transaction because anyone dealing with them would fear that they were spending money actually belonging to the debtor. On a literal reading of subsection (c), if a bank knows that X has declared bankruptcy, and Y deposits in the bank and later withdraws from it $1 million that in fact belongs to X, though the bank neither knew nor had reason to know this, the statute makes the bank liable to X's trustee for $1 million. This cannot have been intended.

> We cannot find a case on the question—maybe the answer is too obvious—but the draftsmen must have intended, and we hold that subsection (c) means, that the relevant knowledge or notice is knowledge or notice to a possessor of property that a bankruptcy proceeding had begun and that the property in the possessor's custody was property of a debtor in that bankruptcy proceeding.

*Matter of USA Diversified Products, Inc.*, 100 F.3d 53, 56–57 (7th Cir.1996).

If the defendants no longer possess any Mushroom property which they received, then the provisions of section 542(c) might well protect them. However, as will be shown below, the same result would occur if I accept the trustee's implicit position that the defendants should be treated as alleged transferees of estate property, not transferors.

**22.** The remarks of Representative Edwards and Senator DeConcini, which were made just prior to the enactment of the Code, have been viewed as "persuasive evidence" of congressional intent due to the status of these elected officials as floor managers of the bankruptcy legislation. *Begier v. I.R.S.*, 496 U.S. 53, 64 n. 5, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990).

Ganz.[23] On the contrary, the evidence is unrebutted that the defendants had lent money either to Mr. Ganz or an entity for which he provided a guarantee, and that the challenged transfers were simply repayments of those earlier obligations. There was evidence that Mr. Ganz had made other, unchallenged payments to these defendants as partial repayment of his legal obligation. (For example, he testified that Fidelity Bank had liquidated certain stock held as collateral on his guarantee. N.T., at 113–114.) Further, these payments were made without any indicia that the funds were derived from an improper source.[24]

Based upon this evidence, I conclude that the defendants were good faith transferees for value. As such, the plaintiff is not entitled to any relief.

## V.

In sum, the bankruptcy trustee proceeded to trial on the theory that the defendants had received funds from Mr. Ganz which were proceeds of funds stolen by him from the Mushroom estates. Further, the trustee believed that Mr. Ganz had no legal obligation to repay these defendants and therefore any payments from him to them should have placed the defendants on notice to inquire about the source of such payments. After reviewing the evidence presented, I conclude that the trustee has failed to prove either of his assertions.

23. The trustee was well aware of this issue at the outset of trial. N.T., at 11; complaint ¶ 31. Indeed, at a pretrial conference, trustee's counsel stated that she intended to address this issue by showing that Mr. Ganz had no legal obligation to pay any funds to these defendants. N.T., at 183. The trustee reasoned that if these defendants received payments from one who had no obligation to them, their suspicions regarding the source of the payment should have been aroused and they would not be bona fide transferees.

Whether the trustee would have prevailed on this theory I need not determine, for the evidence demonstrated that Mr. Ganz did owe repayment to these defendants.

24. I reject as completely unpersuasive plaintiff's argument that the default of U–Rent and the need to exercise on its guarantee should have placed Fidelity on notice of the financial circumstances surrounding Mr. Ganz. Plaintiff's memo-

Accordingly, judgment shall be entered in favor of these defendants.

randum, at 20–21, ¶ 23. A lender takes a guarantee because of the possibility of default by the primary borrower. The later occurrence of such a default would not give the lender any reason to suspect the source of payment from the guarantor.

Similarly unpersuasive is the plaintiff's contention that the A–1 defendants should have been suspicious about the source of Ganz's repayment because: he needed to borrow money in the first place; he did not tender the proceeds of sale of his marital residence promptly; and an individual who was involved in the operations of defendants A–1 was a shareholder in the law firm which employed Mr. Ganz and this law firm should have been vigilant against the conduct of Mr. Ganz. Plaintiff's Memorandum, at 21–22, ¶ 46–47. None of these factors—either singly or combined—would place a lender on notice that the source of repayment of a loan might be converted funds.